[No. A080592. First Dist., Div. Four. Oct. 19, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
MENDES STANLEY BROWN, Defendant and Appellant.

[No. A086546. First Dist., Div. Four. Oct. 19, 1999.]

In re MENDES STANLEY BROWN on Habeas Corpus.

## COUNSEL

Thomas Lundy, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Allan Yannow and Raymond A. Cardozo, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POCHÉ, Acting P. J.**—Defendant, who is African-American, asks us to reverse his conviction on the ground that for a 36-year-period up to and including the date of his grand jury indictment in 1995 no Chinese-Americans, Filipino-Americans or Hispanic-Americans had served as foreperson of a San Francisco indictment grand jury.[1] He contends that the exclusion of these groups from the foreperson position is a denial of equal protection under the law and has abridged his right to due process. He further urges us to find that he was impermissibly denied his right to counsel during the proceedings of the grand jury and its presentment of the indictment against him.

---

[1]Defendant was one of five men who sought to have their indictments quashed and their trials prohibited because the forepersons of the grand jury had never included members of these races or ethnicities, and because the grand juries did not include a fair cross-section of the community. In addition to defendant the five included a Filipino-American male, two Chinese-American males and a Vietnamese-American male.

Although defendant objected to the exclusion of certain other groups based upon age, income or educational attainment, the court declined to find them to be distinct groups. It found only African-Americans, Hispanic-Americans and Asian-Americans to be cognizable groups.

By a petition for a writ of habeas corpus defendant reiterates his equal protection and due process claims, and seeks to bolster those challenges with evidence dating from the years following the denial of his motion to quash his indictment during the first of which he contends the sudden selection of forepersons with Hispanic[2] and Chinese surnames establishes a race-conscious pattern of token inclusion.

## I. *Discussion*

### A. *Background*

#### 1. *History of this Case*

William Marcus was killed on June 17, 1994, apparently in the course of a burglary of his home. Defendant was arrested shortly after Marcus's body was found by investigating officers who discovered defendant hiding in the garage of the residence.

On May 11, 1995, the grand jury returned an indictment charging defendant with the felony murder of Marcus (Pen. Code, §§ 187, 190.2, subd. (a)(17)),[3] which occurred in the course of his burglary of the victim's residence (§ 459) and of robbery (§ 212.5), each charge carrying firearm and deadly weapon use allegations (§§ 12022.5, subd. (a), 12022, subd. (b)). He was further charged with possession of a handgun by one previously convicted of a violent offense (§ 12021.1) and with being an ex-felon in possession of a firearm (§ 12021, subd. (a)(1)), the latter offense carrying sentence enhancement allegations that he had suffered four prior convictions, one of which was for robbery (§§ 667.5, subd. (b), 667, subds. (d) and (e)). At his arraignment defendant pled not guilty to every charge and denied each allegation.

Some weeks later defendant filed a motion to quash the indictment based in part upon the same constitutional challenges he advances here as to the underrepresentation of certain groups as grand jury forepersons and to the composition of the grand jury as a whole on the basis that it did not reflect a fair cross-section of the community.[4] In mid-July he moved to dismiss the indictment (§ 995), again based upon his constitutional claims and on allegations he was improperly denied counsel at the grand jury proceedings.

---

[2]We use the term Hispanic simply for convenience and to avoid confusion because it was the term used below.

[3]Unless otherwise noted all subsequent statutory references are to the Penal Code.

[4]Several other defendants joined in the motion which also sought to prevent their trial by a jury drawn from the existing jury lists on the basis that those lists did not reflect a fair cross-section of the community. The defendants are described as Mendes Brown, an African-

After a lengthy hearing at which considerable testimony and documentary evidence was received, the court took the matter under submission. The motions were denied on March 13, 1997, with a written ruling which concluded that defendant had produced sufficient evidence to establish for equal protection purposes a prima facie showing of discriminatory purpose in the exclusion from the position of foreperson of the indictment grand jury of Chinese-Americans and Hispanic-Americans. This determination was based upon the fact that no individual from either group had ever served as a grand jury foreperson. Nonetheless the court found that the presumption of an improper purpose had been overcome by the city because its "selection criteria and procedures are racially neutral and do not present an opportunity for discrimination." Likewise, it found that defendant was not denied due process because any discrimination which occurred in the selection of the foreperson given the role of that grand juror was "not so significant" as to impugn the fairness of the process and thereby "undermine the integrity of the indictment."

Defendant elected to waive jury trial and submitted the case to trial by the court on the grand jury transcript. In exchange the district attorney agreed not to seek the death penalty. Defendant made an unsuccessful motion for acquittal. The court found defendant guilty on all counts and found true each of the enhancement allegations. Defendant unsuccessfully moved for new trial. The court imposed a sentence of life without possibility of parole on the murder count with the firearm use allegation and stayed sentence on the remaining counts.

### 2. San Francisco Grand Jury

The City and County of San Francisco has dual grand juries—one is of the so-called watchdog variety which has civil investigatory duties. (§ 904.6; see Petersen, *The California Grand Jury System: A Review and Suggestions for Reform* (1974) 5 Pacific L.J. 1, 6.) The other is a traditional indictment grand jury. It is solely this indictment grand jury which concerns us here.

In San Francisco the process of selecting jurors begins with an annually compiled source list of registered voters merged with a list of residents maintained by the Department of Motor Vehicles. From the source list a random selection of 20,000 to 50,000 names is drawn to produce the so-called master list from which 5,000 names are again randomly drawn to be recipients of a juror questionnaire. (§ 904.6, subd. (e).) Those who respond to the questionnaire are placed in the qualified juror pool which

---

American male; Richard Villegas, a Filipino-American male; Mark Chin and Chui Chin, Chinese-American males; and Bao Luu, a Vietnamese-American male.

supplies both grand jurors and petit jurors. A group of 150 to 200 prospective grand jurors from the qualified juror pool are sent a summons to appear for voir dire. Unlike deferrals which may be granted to petit jurors by the jury commissioner, all deferrals or excuse requests from prospective grand jurors must be made to the presiding judge.

Three indictment grand juries, each composed of 19 jurors, are chosen per calendar year to serve successive 4-month terms.[5] For each indictment grand jury the presiding judge of the superior court conducts voir dire to identify the first 30 to 37 individuals who are qualified and able to serve as grand jurors. The exact procedure employed in voir dire is determined by the judge who conducts it. For example, Judge Figone, who voir dired the 1995-A grand jury which indicted defendant, asked the prospective grand jurors to complete a confidential declaration which asked for their name, address, whether they had resided in San Francisco for one year or more, and which provided an opportunity to explain an inability to serve. Judge Figone did not review the confidential declaration until each juror appeared before him for voir dire.

After voir dire has been held from the group of approximately 30 to 37 prospective jurors a random drawing selects the 19 who will serve. One of the 19 is then selected by the presiding judge to serve as grand jury foreperson. (§ 912.) The foreperson selection is not made randomly, and for the years of 1971-1991 was typically made by the presiding judge after he or she had invited the views of the jury commissioner and/or the district attorney serving as grand juror advisor about who on the venire would make a good foreperson.

## B. *Equal Protection*

Defendant's equal protection claim is based on the absence of any indictment grand jury foreperson who was either Hispanic-American, Chinese-American or Filipino-American for a period of some 36 years up to and including the panel which returned his indictment. (U.S. Const., 14th Amend.; *Alexander* v. *Louisiana* (1972) 405 U.S. 625, 628 [92 S.Ct. 1221, 1224, 31 L.Ed.2d 536]; *Johnson* v. *Puckett* (5th Cir. 1991) 929 F.2d 1067.) He argues that such exclusion requires reversal of his conviction.

Defendant, who is African-American, has standing to challenge exclusion on account of race from the forepersons' position of individuals belonging to

---

[5]The adoption of three indictment grand juries per year was apparently begun in 1992. Up until that time a single indictment grand jury was impaneled. The acting executive officer of the superior court testified that because of an anticipated increase in workload which was likely to require several meetings per week of the indictment grand jury, then Presiding Judge Stern instituted the change to lighten the burden on any one grand jury panel.

other cognizable groups. In *Campbell* v. *Louisiana* (1998) 523 U.S. 392, 398 [118 S.Ct. 1419, 1423, 140 L.Ed.2d 551], the court concluded that a White defendant has standing to raise equal protection and due process challenges on behalf of Blacks excluded from grand jury service. The opinion expressly did not, however, reach the question of whether the White defendant's own equal protection rights were violated by discrimination against Blacks. (*Ibid.*) It relied upon the court's previously articulated test for permitting one party to assert the rights of another—namely that the challenge be made by one actually injured by the discrimination and one possessing both a close relationship to the excluded group and an incentive to pursue the vindication of that group's rights. (*Powers* v. *Ohio* (1991) 499 U.S. 400, 411 [111 S.Ct. 1364, 1370-1371, 113 L.Ed.2d 411].)

■ The conviction of a criminal defendant who demonstrates racial discrimination against members of his own race in the selection of the grand jury, and thereby a violation of his own right to equal protection, must be set aside and the indictment quashed. (*Vasquez* v. *Hillery* (1986) 474 U.S. 254, 261, 264 [106 S.Ct. 617, 622, 623-624, 88 L.Ed.2d 598] [Black defendant's challenge to grand jury on which no Black had ever served]; *Rose* v. *Mitchell* (1979) 443 U.S. 545, 551-552, fn. 4, 556, 559 [99 S.Ct. 2993, 2997-2998, 3000, 3001-3002, 61 L.Ed.2d 739] [assumed without deciding that a conviction of Negro defendants indicted by grand jury from which Negroes excluded as forepersons must be set aside].)

To establish a prima facie showing of such discrimination defendant relied upon, and the superior court used, the test set out in *Castaneda* v. *Partida* (1977) 430 U.S. 482, 494 [97 S.Ct. 1272, 1280, 51 L.Ed.2d 498]. The test of *Castaneda* was then applied by the United States Supreme Court some two years later in an equal protection challenge to the selection of grand jury forepersons in *Rose* v. *Mitchell, supra,* 443 U.S. at page 565 [99 S.Ct. at pages 3004-3005].

The People maintain that *Castaneda*'s model for statistical proof of an equal protection challenge is inappropriate in this case, relying upon *McCleskey* v. *Kemp* (1987) 481 U.S. 279 [107 S.Ct. 1756, 95 L.Ed.2d 262]. We cannot agree. *McCleskey* involved an equal protection challenge by a convicted murderer to the capital punishment scheme under which he had been sentenced; he based his claim upon a statistical study showing that as a Black defendant who had killed a White victim he stood a statistically greater chance of suffering the death penalty than a non-Black defendant or a defendant whose victim was non-White. In *McCleskey* the court rejected statistical proof of an equal protection violation in that case, after noting that

it had limited such proof to the special cases of equal protection challenges to the composition of jury venires and to title VII cases. It distinguished those cases from a death penalty decision which is the result of particularized inquiry into the circumstances of the crime and the characteristics of the defendant. (*Id.* at p. 294 [107 S.Ct. at p. 1768].) Clearly, *McCleskey* both on its face and in its rationale does not support abandonment of the *Castaneda* test for the equal protection claim before us.

Under the *Castaneda* three-prong test to establish a prima facie equal protection violation one must: (1) show that the excluded group is a cognizable class; (2) demonstrate a degree of underrepresentation given the proportion of the excluded group in the total population compared to the proportion called to serve as grand jurors over a significant period of time; and (3) show that the selection procedure is susceptible of abuse or is not racially neutral to bolster the presumption of discrimination raised by the statistical disparity. (*Castaneda* v. *Partida*, *supra*, 430 U.S. at pp. 494-495 [97 S.Ct. at pp. 1280-1281].)

The superior court found that a prima facie case of discrimination was made out by defendant as to two cognizable groups—Hispanic-Americans and Chinese-Americans. Hispanic-Americans are a cognizable class. (*Castaneda* v. *Partida*, *supra*, 430 U.S. at p. 495 [97 S.Ct. at pp. 1280-1281] [Mexican-American surnames in case arising in Texas]; *People* v. *Morales* (1989) 48 Cal.3d 527, 543 [257 Cal.Rptr. 64, 770 P.2d 244] [Hispanic surnames].) Likewise Chinese-Americans are a cognizable class because of a long history of discrimination against them, especially in this state and in San Francisco. (*Ho By Ho* v. *San Francisco Unified School Dist.* (9th Cir. 1998) 147 F.3d 854, 863; *People* v. *Lopez* (1991) 3 Cal.App.4th Supp. 11, 15 [5 Cal.Rptr.2d 775] [Chinese-American jurors are a cognizable class for purposes of peremptory challenges to prospective jurors are under *People* v. *Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748].].) However, the court concluded that no prima facie case of discrimination had been made as to women or as to African-Americans.[6]

---

[6]The court based that conclusion on the fact that ". . . three African-Americans and four women had served as forepersons from 1975 to 1991." There was testimony from defense expert Sperlich to the effect that any underrepresentation of African-American forepersons with respect to the grand jury pool from 1975 to 1996 was not statistically significant. Defense expert Weeks testified that the number of African-American forepersons after 1990 constituted substantial overrepresentation with respect to the number of African-Americans in the population.

Defendant presented considerable statistical evidence to demonstrate that the absence of any Hispanic-American or Chinese-American[7] grand jury forepersons over some 36 years was both substantial underrepresentation given their frequency in the population and in the jury pool and was an utterly improbable result of chance. Because no Asians served on an indictment grand jury from 1960 to 1969 and because no Hispanics served on an indictment grand jury from 1960 to 1972, there could have been no foreperson from either group in those years. Once these two groups were represented on indictment grand juries those juries contained 28 percent Asians and 6.1 percent Hispanics. Sperlich testified that the odds of not having an Asian foreperson in 46 opportunities was 3 in 10,000,000.[8]

Finally, defendant contended that the selection of the foreperson was susceptible of manipulation for a nonracially neutral outcome because the presiding judge makes his or her selection after conducting voir dire of the prospective grand jurors and thus after having had an opportunity to observe the jurors and note their race or ethnicity.

Once the prima facie case of discriminatory purpose was made the burden shifted to the city to rebut it. (*Castaneda* v. *Partida, supra,* 430 U.S. at p. 495 [97 S.Ct. at pp. 1280-1281].) In finding that the city had successfully done so the trial court noted that the foreperson is selected by the presiding judge who seeks a foreperson who exhibits "characteristics of leadership and organizational ability." Defendant contends there is insufficient evidence to support the court's finding of no racial bias in the selection procedure.

In its ruling the court cited testimony of Deputy District Attorney Coleman[9] and of Court Executive Officer Tamony[10] to the effect that race had never been a "selection factor" in their respective conversations with the various presiding judges about the selection of a foreperson.

---

[7]It is not clear from the record what became of the challenge as to Filipino-Americans. There was evidence offered by Weeks to the effect that 85 percent of the Asians in the jury pool consisted of Chinese-Americans or Filipino-Americans, with the largest group being the Chinese-Americans who constituted 16.9 percent of all persons in the grand jury pool while Filipino-Americans constituted 5.8 percent of all persons in the pool. Asians account for 21.2 percent of the relevant total population. It may have been the case that the court concluded the statistical evidence of underrepresentation from the smaller Filipino-American population was insufficiently reliable to support a factual finding.

[8]In fact one Asian—a Japanese-American—had served as foreperson in 1988-1989. The expert further testified that his statistical category of Asians included Koreans and Vietnamese, but those subgroups were too small to analyze.

[9]Coleman had served as grand jury adviser from the time of the section of the 1993-B indictment grand jury through the term of the 1996-C indictment grand jury.

[10]Tamony was the assistant executive officer of the court (1976-1996) and prior to that had served as the administrative assistant to the executive officer since 1971. In those capacities he oversaw the process for selecting grand jurors from 1971 through 1991.

 Mere disavowal of a discriminatory purpose is insufficient to rebut a prima facie case. (*Castaneda* v. *Partida, supra,* 430 U.S. at p. 498, fn. 19 [97 S.Ct. at p. 1282].) Here testimony of a nondiscriminatory purpose came not from the selectors themselves, but from the district attorney and from a court executive officer who conferred in chambers with several of the presiding judges during the judges' selection process. It is also relevant that in this case the forepersons were not selected by a single judge using his or her criteria; thus whatever pattern emerged from the aggregate outcome of all the San Francisco foreperson selections could obscure the variables involved in each discrete selection. (See *Hillery* v. *Pulley* (E.D. Cal. 1983) 563 F.Supp. 1228, 1242-1243.)[11] Therefore testimony that race was not discussed as a selecting factor in any of the instances when either of these witnesses was present reasonably could be accorded more weight than might be accorded to a denial from a single selector of a series of forepersons that he or she had never considered race.

The exact procedure for voir dire and for selecting a foreperson from the panel was determined by the current presiding judge. The presiding judge, Judge Figone, who selected the foreman of the grand jury which indicted defendant, devised and used a questionnaire during voir dire which asked each prospective juror to give his or her name and address, how long the individual had been a resident of San Francisco and if there was any reason he or she could not serve. The questionnaire was used by some, but not all, subsequent presiding judges. Judge Figone submitted a declaration to the effect that he first saw the completed questionnaires at the time the jury appeared for voir dire. Thus, while at voir dire the presiding judge had an opportunity to assess the race or ethnicity of the potential jurors, at least as to those judges who used the questionnaire, the grounds advanced by the jurors for excuse were set out in writing in advance of their appearance. This process would have reduced the risk of race-based excusal from the pool by

___

[11]We emphasize that there was no evidence in this case that the district attorney's office suggested or recommended foreperson candidates who were then routinely or consistently selected by whichever judge was presiding. According to Deputy District Attorney Coleman, who served as grand jury adviser under four presiding judges, he sometimes did and sometimes did not ask questions during voir dire of the prospective grand jurors. When asked by the court if ever in his experience as grand jury adviser he had had "challenging power" with respect to "certain prospective jurors" he replied that he had not. Similarly when asked by the court if "in your three or four years before the grand jury" he had "ever influence[d] a [presiding] judge in terms of who to choose," he again said he had never attempted to do so. Likewise Court Executive Officer Tamony testified that in his long experience of foreperson selection he had never been present when a deputy district attorney indicated a preference that a certain individual be chosen as foreperson based upon a perception that the candidate was "pro-police or pro-prosecution" or possessed a "law and order" orientation.

Had there been evidence that the district attorney was in fact choosing which grand juror was ultimately "selected" as foreperson by the presiding judge, we would have a far more difficult case than we do.

identifying the reason for excuse before the court knew the race or ethnicity of the juror.

Typically, the presiding judge would have an in-chambers meeting with the district attorney and the court executive officer following voir dire and the random selection of 19 grand jurors. Tamony described the in-chambers meeting as "not [being] protracted discussions . . . the judge will say: Do you have anybody that you think would make a good foreperson? And you state who it is. And if there's a factor that you want to call to the attention of the judge, you would do so." Tamony and Coleman both testified, however, that the choice was made by the judge. Such conferences permitted input to the selecting judge from other observers, thus reducing the likelihood that any bias the judge might harbor would go unchallenged.

The trial court's conclusion that the selection was made on race-neutral criteria was supported by other evidence elicited from Coleman and Tamony. What the trial court's decision characterized as leadership and organizational ability were described in some particularity by the district attorney and the court executive officer. Coleman believed, based upon his conversation with the judges, that they looked to see if the potential foreperson arrived late or barely on time, demonstrated "people skills" such as the likely capacity to motivate others to work together, and was likely possessed of some administrative skills or experience. Tamony evaluated the candidates in terms of their ability to get along well with others, conduct meetings, see to it that the grand jurors would attend sessions and be discrete and calm in the face of stressful situations—in short someone with leadership capability. When asked about why a particular foreperson was selected Coleman noted that the individual who worked as an insurance claims examiner had a job requiring him to "deal[] with paper constantly" and displayed a very sunny disposition, making him a good candidate to perform both the ministerial and administrative duties of the foreperson.

In short the particular criteria which were used, while they may have varied somewhat from presiding judge to presiding judge, were specific and job related. This is not a case in which the forepersons were chosen because they were moral, or upright, or a "better type" of individual who would make a "proper" foreperson. (*Hillery* v. *Pulley*, *supra*, 563 F.Supp. at p. 1248.) Here the focus was upon personality traits and abilities which made for successful forepersons. Admittedly a process in which the jurors were never seen by the selector would have avoided any possibility of racial bias, but it would also have precluded any actual opportunity for the presiding judge to view the social interaction of the jurors with one another and with court personnel, an interaction crucial to successful service as a foreperson.

We reject defendant's contention that the city failed to rebut the presumption of race-based discrimination in the selection of grand jury forepersons, and we find substantial evidence to support the trial court's ruling.

Finally, defendant advances a variant on his equal protection claim, to wit: he argued below and reiterates on appeal his view that the selection of grand jury forepersons shifted to a race-conscious pattern of preference for African-Americans and women in the years from 1993 through 1996. His argument is that even if the exclusion of Hispanic-Americans, Chinese-Americans and Filipino-Americans during that period was "caused in whole or in part" by an effort to include more African-Americans and women, the impact on the other excluded groups was still violative of equal protection.

The simple answer to his contention is that the trial court found no such conscious policy or practice of including greater numbers of women and African-Americans in that period. Nor do we believe it erred in failing to do so. Indeed the pattern of nearly all White male forepersons was interrupted between 1975 through 1992 by seven female forepersons, two of whom were African-American women. Likewise, two African-American male forepersons served between 1990 and 1992. Thus, the selection of African-American and female forepersons had begun before the period to which defendant points.

Most significantly, the absolute number of forepersons who served increased by at least two per year beginning in 1992 when the court adopted the practice of generally appointing three indictment grand juries per year instead of a single grand jury. Before this change a presiding judge who served for one year appointed only one grand jury foreperson; after the change a presiding judge would likely appoint three forepersons during the presiding judge's one-year term. Although defense experts Sperlich and Weeks testified that the pattern of appointments of African-Americans and women in the mid-1990's increased so substantially as to permit the inference that a race-conscious selection was occurring, neither expert did more than note the increase in numbers. Neither expert assessed whether the reduction in the length of the grand jury term might have impacted the availability of African-Americans or women to serve as forepersons. Nor did the experts seek to account for how the increased number of appointments per presiding judge might impact their statistics.

In any event, according to the testimony of defendant's own expert the effect of the allegedly race-conscious selection of African-Americans resulted in a frequency of overrepresentation of African-American forepersons by "about . . . two and a half times as many as one would expect given their

representation in the community." Thus, defendant, an African-American, is in the anomalous position of seeking a reversal of his conviction because of the exclusion of Hispanic-Americans, Chinese-Americans and Filipino-Americans from the post of grand jury foreperson, an exclusion occurring at a time when members of his own racial group were selected considerably in excess of their frequency in the population as a whole.

Because we find substantial evidence to support the superior court's conclusion that the claim of discrimination was rebutted, we need not reach the question of what the proper remedy would be had defendant's equal protection claim gone unrebutted.

## C. *Due Process*

A criminal defendant by virtue of his conviction has standing to challenge a discriminatory process of selecting grand jurors or grand jury forepersons. (*Campbell* v. *Louisiana, supra,* 523 U.S. 392, 401 [118 S.Ct. 1419, 1424-1425].) Moreover, defendant may raise a due process claim on the basis of discriminatory selection of grand jury forepersons, regardless of whether he is a member of the groups excluded. (*Hobby* v. *United States* (1984) 468 U.S. 339, 342 [104 S.Ct. 3093, 3095, 82 L.Ed.2d 260] [White male defendant challenging exclusion of women and African-Americans from the post of grand jury foreman in the federal courts].)

The inquiry in a due process claim is whether or not the challenged conduct has impinged upon the defendant's fundamental right to a fair process. (*Hobby* v. *United States, supra,* 468 U.S. at p. 346 [104 S.Ct. at p. 3097].) Unless it has, defendant is not entitled to a reversal of his conviction or a dismissal of his indictment. (*Ibid.*)

The narrow question of what remedy was appropriate for discriminatory selection of a federal grand jury foreman was before the court on a due process claim in *Hobby* v. *United States, supra,* 468 U.S. at page 342 [104 S.Ct. at page 3095]. In that case the court looked to the nature of the federal foreperson's duties and the manner of his or her selection and concluded that the post was primarily ministerial and that "[t]he foreman has no authority apart from that of the grand jury as a whole to act in a manner that determines or influences whether an individual is to be prosecuted." (*Id.* at p. 345 [104 S.Ct. at p. 3096].) In the federal courts, as is true in California, the grand jury foreman is selected by the court from among those already selected to serve on the grand jury. (Fed. Rules Crim.Proc., rule 6(c), 18

U.S.C.;[12] Pen. Code, § 912.) In that respect the foreperson selection process used in the federal system and in San Francisco Superior Court stands in sharp contrast to the Tennessee procedure at issue in *Rose* v. *Mitchell, supra,* 443 U.S. at page 548, footnote 2 [99 S.Ct. at page 2996]. In *Rose* the foreperson of the grand jury was selected by the court from the public at large, rather than from the ranks of the jurors themselves and thus functioned as a 13th juror who could "be viewed as the surrogate of the judge" and as having a "virtual veto power over the indictment process." (*Hobby* v. *United States, supra,* 468 U.S. at p. 348 [104 S.Ct. at p. 3098]; *Rose* v. *Mitchell, supra,* 443 U.S. at p. 548, fn. 2 [99 S.Ct. at p. 2996].)

The *Hobby* court reasoned that given the ministerial nature of the federal foreman's duties a discriminatory appointment to the post could not have such impact upon a defendant's indictment as to undermine its integrity. (*Hobby* v. *United States, supra,* 468 U.S. at p. 345 [104 S.Ct. at pp. 3096-3097].) Moreover, if the grand jury as a whole was properly constituted—that is it reflected the community from which it was drawn—the discriminatory selection of one member of the body to serve as foreman would not operate to impinge upon a defendant's due process right to be treated fairly. (*Id.* at p. 346 [104 S.Ct. at p. 3097].) Thus, the court declined to apply the remedy of reversal. (*Id.* at pp. 342-343, 346 [104 S.Ct. at pp. 3095-3096, 3097].)

Defendant objects to applying the holding of *Hobby* to this case, arguing that the role of the grand jury foreperson in California is not analogous to the role of the federal foreman, and thus the rationale underpinning the *Hobby* outcome is lacking here. We need not reach the merits of his claim, because even if we assume that the California grand jury foreperson has a somewhat more significant role than that of his federal counterpart[13] and that the forepersons, chosen from among those randomly selected grand jurors to be

---

[12]The rule provides in pertinent part that "The court shall appoint one of the jurors to be foreperson and another to be deputy foreperson. The foreperson shall have power to administer oaths and affirmations and shall sign all indictments. The foreperson . . . shall keep a record of the number of jurors concurring in the finding of every indictment and shall file the record with the clerk of the court . . . ." (Fed. Rules Crim.Proc., rule 6(c), 18 U.S.C.)

[13]The statutorily prescribed duties of the grand jury foreperson in California include administering oaths to grand jury witnesses (§ 939.4) and directing any grand juror who harbors bias to retire (§ 939.5). An indictment cannot be found without an endorsement which must be signed by the foreperson (§ 940), and the indictment must be presented by the foreperson in the presence of the grand jury to the court (§ 944).

According to *Hobby* "the responsibilities of a federal grand jury foreman are essentially clerical in nature; administering oaths, maintaining records, and signing indictments." (*Hobby* v. *United States, supra,* 468 U.S. at pp. 344-345 [104 S.Ct. at p. 3096].) In contrast to California where the failure of the foreperson to sign the endorsement requires the indictment be set aside upon a motion by the defendant (§ 995, subd. (a)(1)(A)), the absence of the

on the panel, underrepresented certain groups in the community, defendant would not be entitled to a reversal of his conviction because he has failed to demonstrate that he suffered actual prejudice.

This court has previously held that a due process challenge to the composition of the grand jury as underrepresentative of the proportion of Mexican-Americans in the community even if established, absent a showing of actual prejudice, does not entitle a defendant to an automatic reversal of his conviction, but is subject to harmless error analysis. (*People* v. *Corona* (1989) 211 Cal.App.3d 529, 537 [259 Cal.Rptr. 524]; see *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].) Defendant offers no compelling reason for us to depart from this precedent and we decline to do so.

### D. *Right to Counsel*

 Defendant argues he was wrongfully denied his right to counsel during the grand jury proceedings and at presentment of the indictment. Defendant acknowledges that the United States Supreme Court has held that the right to counsel attaches only with the initiation of adversary proceedings. (*Kirby* v. *Illinois* (1972) 406 U.S. 682, 688 [92 S.Ct. 1877, 1881-1882, 32 L.Ed.2d 411].) Likewise that court has concluded that a grand jury proceeding "is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather it is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." (*United States* v. *Calandra* (1974) 414 U.S. 338, 343-344 [94 S.Ct. 613, 618, 38 L.Ed.2d 561].) Nonetheless, defendant argues that the nature of a grand jury indictment proceeding under California law differs sufficiently from its federal counterpart that a right to counsel should attach during a grand jury proceeding in this state.

We are unpersuaded that certain protections which California has chosen to build into its grand jury proceedings—namely prohibiting the use of evidence which would not be admissible at a trial (§ 939.6, subd. (b)), requiring the prosecutor to present evidence exculpatory of defendant (§ 939.71), and allowing indictments or charges in them to be set aside for insufficient evidence (§ 995)—have transformed the grand jury proceeding from one that is investigatory to one that is adjudicatory. Reliable evidence helps ensure an accurate investigation. Exoneration of unfounded or baseless charges is the only fair outcome when the investigation leads to that result. (See *McClatchy Newspapers* v. *Superior Court* (1988) 44 Cal.3d 1162,

---

foreman's signature in the federal courts is a "mere technical irregularity that is not necessarily fatal to the indictment." (468 U.S. at p. 345 [104 S.Ct. at p. 3096].)

1174-1175 [245 Cal.Rptr. 774, 751 P.2d 1329] [Secrecy of grand jury proceedings avoids the injury to reputation of those exonerated.].) In short, the protections to which defendant points affect the manner in which a California indictment grand jury operates, but they do not change the investigatory nature of its proceedings. "[T]he grand jury serves as part of *the charging process* of criminal procedure, not *the adjudicative process* that is the province of the courts or trial jury." (*Cummiskey* v. *Superior Court* (1992) 3 Cal.4th 1018, 1026 [13 Cal.Rptr.2d 551, 839 P.2d 1059].)

Nor are we persuaded that defendant's right to counsel had already attached almost a year before the grand jury proceedings began. Defendant was charged by criminal complaint in municipal court with the homicide on June 21, 1994, and was arraigned. In May 1995 the district attorney sought and obtained a grand jury indictment, and thereafter on a motion by the people the complaint was dismissed. Defendant was represented in the municipal court prosecution by counsel. He argues that because his right to counsel had attached in the municipal court he was entitled to counsel in the subsequent grand jury proceedings. He is wrong.

The purpose of the right to counsel is "to protect the accused during trial-type confrontations with the prosecutor." (*United States* v. *Gouveia* (1984) 467 U.S. 180, 190 [104 S.Ct. 2292, 2298, 81 L.Ed.2d 146].) The proceedings before the grand jury simply were not, as we have outlined above, trial-like, and from that premise it has always followed that the person under investigation by a grand jury has no right to appear or offer evidence. (4 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Proceedings Before Trial, § 2046, p. 2410.) Thus, even when the subject of a grand jury investigation is summoned to appear before the grand jury our California Supreme Court declined to find that the subject's Sixth Amendment right to counsel had attached. (*United States* v. *Williams* (1992) 504 U.S. 36, 49 [112 S.Ct. 1735, 1743, 118 L.Ed.2d 352].)

Finally defendant contends he should have been represented by counsel at the presentment of his indictment, because it too was a critical stage of his prosecution. An indictment once found must be presented. (§ 944.) Its presentation by the grand jury to a competent court charges the defendant (§ 889) and marks the point at which the government commits itself to prosecute him with a formal charge, therefore defining the point at which his right to counsel attaches. (*United States* v. *Gouveia, supra,* 467 U.S. at p. 189 [104 S.Ct. at p. 2298], quoting *Kirby* v. *Illinois, supra,* 406 U.S. 682, 689 [92 S.Ct. 1877, 1882].) Until the presentment defendant's right to counsel did not attach.

## E. *Habeas Corpus Petition*

■ While defendant's appeal was pending in this court he filed a petition for habeas corpus by which he has sought to put before us additional evidence relating to the grand jurors and the grand jury forepersons who have served on indictment grand juries from 1997 through the 1999-A grand jury. We requested and received an informal response from the People as to the sufficiency of the petition. (*People* v. *Romero* (1994) 8 Cal.4th 728, 737 [35 Cal.Rptr.2d 270, 883 P.2d 388].) Because the petition is intimately linked to an argument raised on appeal we describe petitioner's claim.

By his petition he seeks to augment the evidence in support of the contention he raises on appeal that selection of forepersons from underrepresented groups in the period immediately following the denial of his motion to quash reflected a race-conscious effort to rectify prior underrepresentation, and therefore it is circumstantial evidence bolstering his equal protection claim of intentional discrimination. (*Hillery* v. *Pulley, supra*, 563 F.Supp. at p. 1248.) In support of his petition he offers the declaration of Dr. Weeks (who testified as an expert at trial): (1) as to the statistical likelihood of the pattern of foreperson selection which occurred in 1997; and, (2) Dr. Weeks's opinion that the pattern of forepersons chosen in 1997 is "consistent with a race-conscious policy" of selection. Defendant also argues that the absence of Hispanic-Americans from three consecutive grand jury panels is "suggestive of a systematic exclusion."

We find petitioner has failed to establish a prima facie case which, if true, would entitle him to relief. (*In re Clark* (1993) 5 Cal.4th 750, 769, fn. 9 [21 Cal.Rptr.2d 509, 855 P.2d 729].) Evidence that two of the three 1997 indictment grand jury forepersons were Asian and one was Hispanic might be circumstantial evidence of a conscious change in the selection policy of a single selector who had previously never selected a foreperson of either ethnic group. That, at least, was the rationale advanced for looking at such evidence in *Hillery* v. *Pulley, supra*, 563 F.Supp. at pages 1230, 1248. In *Hillery* no Blacks had served on the Kings County grand jury from 1893 until the year after Hillery, a Black man, sought to quash his 1962 indictment on account of that racial exclusion. The presiding judge who had selected all the grand jurors for the seven grand juries preceding the one which indicted Hillery also presided over the process in the following year and in that next year selected a Black grand juror. (*Ibid.*)

The factual scenario before us is significantly different. Although there were three grand jury forepersons selected in 1997, only two of them were selected by the same judge. Therefore the "series" of selections upon which

petitioner relies is a very short one. Moreover, the inference that petitioner seeks to draw is substantially less reliable as a demonstration of discriminatory intent on the part of a lengthy list of *prior presiding judges* who had done the selection of forepersons than it was in *Hillery* where the same judge had picked all the grand jurors for at least eight, if not nine, successive years.

## II. *Disposition*

The judgment is affirmed. Defendant's petition for habeas corpus is denied.

Sepulveda, J., and Swager, J.,* concurred.

A petition for a rehearing was denied November 18, 1999, and appellant's petition for review by the Supreme Court was denied January 25, 2000. Mosk, J., was of the opinion that the petition should be granted.

---

*Associate Justice of the Court of Appeal, First District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.