Mark Shew Fei CHIN, Petitioner,

v.

David RUNNELS, Warden, High Desert
State Prison, California,
Respondent.

No. C 04–01258 CRB.

United States District Court,
N.D. California.

Oct. 29, 2004.

ant to 28 U.S.C. § 2254. Chin was convicted of second degree murder with an arming allegation and was sentenced to 19 years to life in prison. He is currently imprisoned at High Desert State Prison in Susanville, California, and seeks an order vacating his conviction and sentence. Chin argues that Chinese–Americans, Filipino–Americans and Hispanic–Americans were excluded from service as foreperson on the grand jury that indicted him, violating his right to equal protection. For the reasons stated below, the petition is DENIED.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### a. Overview

The facts regarding Chin's conviction are not at issue in this petition, and were amply laid out by the California Court of Appeal:

> In the early morning hours of February 8, 1996, See Quen Lee was shot to death as he sat in a van parked in the driveway of his home. $ 1,740 in cash was found under his body.

> San Francisco Police Officers Cole and Rand apprehended defendant Chin as he fled from the scene with a gun. Minutes later Daly City police stopped a red Toyota Officer Cole had seen speeding away from the scene. The driver, Chui Chin (Chui) was defendant's older brother. A second handgun was found in the car. Officer Cole identified Chui as the man he had seen driving away from the shooting.

> [On October 29, 1996, a] San Francisco grand jury indicted defendant for felony murder, attempted robbery and related firearm allegations. Defendant subsequently joined in a "Motion to

Linda Buchser, San Francisco, CA, for Plaintiff.

Christina Vom Saal, Deputy Attorney General, San Francisco, CA, for Defendant.

## MEMORANDUM AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

BREYER, District Judge.

## I. INTRODUCTION

Petitioner, Mark Shew Fei Chin, filed a petition for Writ of Habeas Corpus pursu-

Quash the Indictment and Prohibit the Trial of Defendant by a Jury Drawn from Existing Jury Lists." The motion was originally filed by Mendes Brown, who had been indicted by the same grand jury in an unrelated case. (*See People v. Brown* (1999) 75 Cal.App.4th 916, 920–921, fn. 4, 89 Cal.Rptr.2d 589.) The trial court denied the motion after an extensive evidentiary hearing. Defendant joined in a consolidated petition for writ of mandate and a petition for Supreme Court review. Both were denied. (*Brown v. Superior Court*, petn. denied April 15, 1997, A077854; *Brown v. Superior Court*, review denied May 30, 1997, S060870.)

At trial, the prosecution's theory was that defendant shot Lee during a failed robbery attempt. Defendant contended he shot Lee in self-defense while suffering from paranoia and impaired judgment caused by cocaine intoxication and addiction.

Defendant was convicted of second degree murder with an arming allegation. *People v. Chin*, A092372, 2002 WL 31402087, *1–2, 2002 Cal.App. Unpub. LEXIS 9870, at *1–*3 (Cal.Ct.App. Oct. 25, 2002) (unpublished).

Chin was subsequently sentenced to 19 years to life in state prison. He then filed a timely notice of appeal with the California Court of Appeal, First District, which affirmed Chin's judgment of conviction and sentence on October 25, 2002. The appeal was based on the same allegations that Chin had raised with defendant Brown in his "Motion to Quash the Indictment and Prohibit the Trial of Defendant by a Jury Drawn from Existing Jury Lists" (hereinafter "Motion to Quash"). The allegations included the claim that the exclusion of Chinese–Americans, Hispanic–Americans and Filipino–Americans from service as the grand jury foreperson in San Francis-

co over a 36–year period violated Chin's right to equal protection under the Fourteenth Amendment of the U.S. Constitution. Chin is Chinese–American. Petition at 1. On January 15, 2003, the California Supreme Court denied Chin's Petition for Review. *People v. Chin*, S111765 (Cal. Jan. 15, 2003) (unpublished). As no appeals or proceedings remained pending in any other court, Chin filed a petition for Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254 on March 30, 2004.

**b. San Francisco's Grand Jury Foreperson Selection Process**

San Francisco's process for selecting grand juries and grand jury forepersons, which lies at the heart of Chin's petition, was described by the California Court of Appeals in *People v. Brown:*

> In San Francisco the process of selecting jurors begins with an annually compiled source list of registered voters merged with a list of residents maintained by the Department of Motor Vehicles. From the source list a random selection of 20,000 to 50,000 names is drawn to produce the so-called master list from which 5,000 names are again randomly drawn to be recipients of a juror questionnaire. (§ 904.6, subd. (e)). Those who respond to the questionnaire are placed in the qualified juror pool which supplies both grand jurors and petit jurors. A group of 150 to 200 prospective grand jurors from the qualified juror pool are sent a summons to appear for voir dire. Unlike deferrals which may be granted to petit jurors by the jury commissioner, all deferrals or excuse requests from prospective grand jurors must be made to the presiding judge.

> Three indictment grand juries, each composed of 19 jurors, are chosen per

calendar year to serve successive 4–month terms. For each indictment grand jury the presiding judge of the superior court conducts voir dire to identify the first 30 to 37 individuals who are qualified and able to serve as grand jurors. The exact procedure employed in voir dire is determined by the judge who conducts it. For example, Judge Figone, who voir dired the 1995–A grand jury which indicted defendant, asked the prospective grand jurors to complete a confidential declaration which asked for their name, address, whether they had resided in San Francisco for one year or more, and which provided an opportunity to explain an inability to serve. Judge Figone did not review the confidential declaration until each juror appeared before him for voir dire.

After voir dire has been held from the group of approximately 30 to 37 prospective jurors a random drawing selects the 19 who will serve. One of the 19 is then selected by the presiding judge to serve as grand jury foreperson. (§ 912) The foreperson selection is not made randomly, and for the years of 1971–1991 was typically made by the presiding judge after he or she had invited the views of the jury commissioner and/or the district attorney serving as grand juror advisor about who on the venire would make a good foreperson. *People v. Brown*, 75 Cal.App.4th 916, 921–22, 89 Cal.Rptr.2d 589 (1999). Discussions between the judge, the jury commissioner and/or the district attorney regarding the selection of a foreperson were made off the record. Evidentiary Hearing Reporter's Transcript [hereinafter "RT"], Vol. 4 at 744. Once the judge selected a foreperson, that person was called into the judge's chambers to make sure he or she was willing to accept the position. *Id.* at 746.

From 1960 to 1991, one grand jury foreperson was chosen each year to serve a term of one year. Notice of Appeal at 477. Thereafter, three forepersons were chosen per year. *Id.* With the exception of one judge (Judge Stern), no judge had selected more than three forepersons over the 36–year period at issue. *Id.* Judge Figone,[1] the presiding judge who selected the foreperson for the grand jury that indicted Chin, had selected two other forepersons during that period. *Id.*

The foreperson selected by Judge Figone in the 1995 "A" grand jury that indicted Chin was a white architectural consultant for the United States Supreme Court who held a Master's Degree. Seventeen of the nineteen grand jurors were identified by race as follows: seven whites, seven Asian–Americans, two Latino–Americans,[2] and one African–American. Answer at 3.

### c. Evidentiary Hearing

After Chin joined Brown in his Motion to Quash, an extensive nine-day evidentiary hearing was conducted. Petition at 2. As part of this hearing, the defense introduced evidence regarding the grand jury foreperson selection process, including statistics reflecting the race of individuals chosen to serve as grand jury foreperson. In addition to this, Deputy District Attor-

---

1. Judge Figone passed away on August 12, 1999.

2. Petitioner's allegations use both the terms "Latino–Americans" and "Hispanic–Americans." For the purposes of this petition, this Court assumes that the distinction between these terms is immaterial, particularly given that the Court finds that petitioner's claims with respect to the exclusion of Chinese–Americans is sufficient to support his standing. *See infra* Part VI.a.

ney Jerry Coleman and Assistant Executive Officer of the Superior Court Michael Tamony provided testimony regarding the practices of judges in selecting forepersons. Both men had assisted the judges in conducting the selection process during the relevant period. Judge Figone also submitted a declaration.[3] At the close of the hearing, the trial court denied Brown and Chin's motion.

### 1. Statistical Evidence

Petitioner presents uncontroverted statistical evidence demonstrating that from 1960 to 1996, the grand jury forepersons selected in San Francisco were under-representative with respect to three groups. Based on a review of surnames contained in lists of grand jury forepersons, demographic surveys, expert opinions, and the findings of the court in *Quadra v. Superior Court*, 378 F.Supp. 605 (N.D.Cal.1974),[4] petitioner concludes that between 1960 and 1996 there was not a single Hispanic-American, Chinese-American or Filipino-American grand jury foreperson. Petition at 4–5.

During this period, Chin alleges that the grand jury pools from which the forepersons were chosen were made up as follows: 13.4% Chinese-American; 6.9% Hispanic-American; and 4.0% Filipino-American. Petition at 5 n. 5. Chin further points to an expert opinion that the chance of a random selection system not choosing a member of one of these groups during the 1975–1995 period—a period during which 30 forepersons were selected—is .0003%. Petition at 6, Notice of Appeal at 477. The experts also found that during the same period there were Chinese-American and Filipino-American grand jurors who had comparable age, education and occupational characteristics to the individuals selected. *Id.* Notably, however, petitioner does not allege precisely how many individuals with those qualifications were represented in the pool of potential forepersons.

Chin also cites evidence that after 1992, when the exclusion of women and African-American forepersons was challenged in *People v. Ramirez*, SCN 140188,[5] the number of forepersons from those two groups increased dramatically. Specifically, Chin alleges that from 1975 through April 1992, 14% of forepersons were African-American and that from May 1992 to 1996, the number increased to 33%. Petition at 10. Chin alleges a similar increase in the representation of women, from 24% during

---

**3.** Judge Figone's declaration did not address the grand jury foreperson selection process. Instead, the short statement was directed towards other issues raised in the Motion to Quash that are not now before this Court. *See* Rule 35(E) Request of 2–19–02 (Motion to Quash), at 185 (Declaration of Honorable Richard P. Figone of February 7, 1996).

**4.** *Quadra*—petitioner's sole basis for assuming an exclusion of these groups between 1960 and 1969—provides a tenuous basis for petitioner's claims. In *Quadra* the court first reviewed plaintiffs' statistical evidence in a motion to dismiss, and therefore assumed them to be true. *See Quadra*, 378 F.Supp. at 618. However, once the court proceeded to plaintiffs' motion for summary judgment, it denied it because the data they had presented were "not derived from official sources," the statistics were "not complete," and the data-gatherer was "not shown to be an expert in the field" who had not explained her methodology. *Id.* at 624. In fact, the groups for which the data were incomplete included Asians and Latinos. *Id.* at 628, Appx. A. However, notwithstanding *Quadra's* inconclusiveness, neither the courts below nor respondent here have challenged petitioner's overall statistical showing. Because this Court finds that the showing for the years 1975–1996 rests on somewhat more stable foundations, the Court finds that the lower court findings of a prima facie case of discrimination should not be disturbed.

**5.** *Ramirez* was filed but never litigated. Petition at 10.

the 1975–1992 period to 60% during the period from May 1992–1996. *Id.* Chin's experts testified that this magnitude of change was unlikely to be produced randomly and was therefore indicative of a change in policy. Petition at 10.

Lastly, Chin has pointed to evidence that, of the three grand juries that were chosen immediately after the denial of his motion, two had forepersons with Chinese names and one had a foreperson with a Hispanic name. Petition at 11.

### 2. Assistant Executive Officer Tamony's Testimony

Michael Tamony, Assistant Executive Officer of the Superior Court, had overseen the grand jury selection process for twenty years. He testified that the judges selected the foreperson after an off-the-record, in-chambers discussion with either himself or the deputy district attorney, who was an advisor to the grand jury. RT, Vol. 4 at 744. Tamony stated that he considered the following attributes when recommending a foreperson:

> First of all, you need somebody who can get along with the other people; someone who can conduct a meeting; someone who can be sure the jurors are attending to business.... Somebody who can act to make sure the grand jury is doing what it's supposed to be doing and be able to report to the judge if there's any problems

*Id.* 747–48. Tamony agreed that in making recommendations he looked for individuals with "leadership capability." *Id.*

Tamony "assumed that the [judges] would have similar thoughts" as to the importance of these criteria in making selection. *Id.* at 776. Tamony also testified that what was discussed during the in-chambers discussions with the judges "depends on the judge." *Id.* at 744. He elaborated that:

These are not protracted discussions. It's just the question of going in, sitting down, and the judge will say: Do you have anybody that you think might make a good foreperson? And you state who it is. And if there's a factor that you think you might want to call to the attention of the judge, you would do so.

*Id.* at 749.

Tamony could not recall the foreperson's race ever being discussed. *Id.* at 751. The record shows that Chin's counsel pressed Tamony to state that race was discussed, and that Tamony would only admit that the subject of race "may have come up," although "not for the reason for choosing someone...." RT, Vol. 4 at 752.

### 3. Deputy District Attorney Coleman's Testimony

Deputy District Attorney Jerry Coleman was the grand jury advisor from 1993 through 1996 and had worked with four different judges. Coleman testified that the presiding judge would "typically, though not necessarily all the time" ask him for input regarding the grand jury foreperson or secretary selection. RT, Vol. 5 at 974. He stated that "all the judges do it differently" but was left with the following impression:

> My general impression is always that the judge select[s] someone that would be a good leader, that could motivate people to work together, that the judge pick[s] a person who would have certain administrative skills that would assist them in performing their functions.

*Id.*

Coleman stated that he recommended forepersons with "administrative abilities, leadership and people skills." *Id.* at 975. He based his recommendations on "some occupational information that was available at the time of selection" and from his own

observations of the jurors' participation and timeliness. *Id.* at 975–76. Coleman speculated that the judges also utilize occupational information during the foreperson selection process. *Id.* 994. Punctuality was also a criteria the Coleman recalled judges discussing in the context of selecting forepersons. *Id.* at 996–97. Coleman testified that one foreperson was "a perfect example" of what he believed judges looked for: "He was a claims examiner for [AAA]. He dealt with paper constantly. He also had a totally sunny disposition, friendly ... [a] hardy handshake sort of guy." *Id.* 995.

Coleman also gave his opinion regarding the increase in African–American and female forepersons. In a declaration, he stated that the forepersons and secretaries selected from 1993 through 1996:

> were selected based upon their ability to perform administrative functions. I am informed and so believe that the racial, gender, and age-diversity of such officers represents race conscious selection policies designed to preserve rather then skew group opportunities through inclusiveness ...

Answer at 5.

When asked to explain this belief, Coleman stated:

> I examined the list of forepersons and secretaries that I had previously averred to; and it was my belief based on this practice with the judges that it would appear that there is an attempt by the judges to include, for example, more women, more people of color among all the officers of the grand jury than perhaps had been included before when I wasn't part of the process ... I didn't specifically ask the judge if that was a policy, nor did ... any judges ... I dealt with tell me that was the policy.

So it's simply a belief that I have based on the pattern that I saw.

RT Vol. 5 at 981–82.

Coleman could not recall the foreperson's race ever being discussed by the judges. *Id.* at 984–85. However, as Chin points out, Coleman testified that "the topic of race in general may have come up in some discussions with the judges...." *Id.* Coleman also explained, though, that he didn't recall race ever being discussed as a consideration for the choosing of a foreperson. *Id.*

Like Tamony, Coleman made it clear that the judge was the ultimate selector of the foreperson. He testified that he "can't speak for what the judges were thinking, either individually or collectively, if anything, about this process." *Id.* at 983. Finally, there was no evidence either Tamony or Coleman were present during all the foreperson selections. However, the record does show that Coleman was present during, and participated in, the selection of the grand jury foreman that sat on the grand jury that indicted petitioner. *Id.* at 979–80. Coleman could not recall what was said on that particular occasion. *Id.*

## III. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action under 28 U.S.C. § 2254 and 28 U.S.C. § 1331. Venue is also proper because the challenged conviction occurred in San Francisco County, California, which is located within this judicial district. 28 U.S.C. § 2241(d).

## IV. EXHAUSTION

State prisoners who wish to make a collateral challenge using federal habeas proceedings to either the fact or length of their confinement are first required to exhaust state judicial remedies. 28 U.S.C. § 2254(b), (c). Here, Chin's petition for

review by the California Supreme Court was rejected on January 15, 2003 and no other direct review in state court remains. Accordingly, he has satisfied the exhaustion requirement.

## V. STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The "contrary to" and "unreasonable application" clauses each provide separate and independent grounds for relief. Id., at 404–05, 120 S.Ct. 1495 (2000).

■ Where, as here, the California Supreme Court denies review of petitioner's claim without explanation, this Court looks to the last reasoned state court decision in conducting habeas review. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir.2000) (citation omitted), cert. denied, 534 U.S. 944, 122 S.Ct. 324, 151 L.Ed.2d 242 (2001) (district court "looks through" unexplained California Supreme Court decision to last reasoned state court decision). The relevant opinion in this case is the decision of the California Court of Appeals in People v. Chin, A092372, 2002

WL 31402087, 2002 Cal.App. Unpub. LEXIS 9870 (Cal.Ct.App. Oct. 25, 2002) (unpublished). However, because People v. Chin relied heavily on the court's decision in People v. Brown, this Court will also review the reasoning there, insofar as it supports the judgment in the case at bar. See Chin, 2002 WL 31402087, *6, 2002 Cal. App. Unpub. LEXIS at *21–*22 (citing People v. Brown, 75 Cal.App.4th at 925, 89 Cal.Rptr.2d 589).

## VI. DISCUSSION

Chin's petition rests on his assertion that the "total exclusion of three cognizable groups as the grand jury foreperson over a 36-year period" violated equal protection. Petition at 12. Chin argues that the state court judgment was an "unreasonable application" of federal law and that the state court made an "unreasonable determination of the facts." Petition at 22, 25.

### a. Standing

■ In Brown v. Garcia, 236 F.Supp.2d 1121 (N.D.Cal.2002), a court in this district dismissed Mendes Brown's habeas petition challenging his conviction based in part on alleged discrimination in the San Francisco grand jury selection process. As discussed above, Brown was the original party to the evidentiary hearing which produced the statistics Chin relies on in the case at bar. Based upon the similarity of the cases, respondent now relies on Brown v. Garcia as authority justifying dismissal here. Answer at 9–13. There, the court found that Brown, an African–American, had not alleged the requisite injury-in-fact to provide standing to seek habeas relief because African–Americans were not one of the groups excluded from service as foreperson. 236 F.Supp.2d at 1128. The court based its reasoning on the Supreme Court's holding in Campbell v. Louisiana,

523 U.S. 392, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998), which held that a white criminal defendant could—via third-party standing—bring an equal protection challenge to discrimination against African–Americans on his grand jury. *Brown v. Garcia*, 236 F.Supp.2d at 1128. According to the court, *Campbell's* holding with respect to third-party standing was limited to cases in which the discrimination affected the composition of the grand jury. The court found that, in California, where the foreperson is selected from already seated grand jurors and therefore does not affect the body's overall composition, there is no third party standing for habeas petitioners to challenge discriminatory selection of the foreperson. *Brown v. Garcia*, 236 F.Supp.2d at 1129. Because Brown failed to demonstrate the required injury-in-fact, his petition, insofar as it was based on a violation of equal protection, was dismissed. *Id.*

Respondent is incorrect in arguing that *Brown v. Garcia* forecloses petitioner's standing in this case. Here, unlike *Brown v. Garcia*, petitioner's equal protection claim is one of first-party standing in that it alleges that individuals of petitioner's own group (Chinese–Americans) were excluded from serving as foreperson. The Supreme Court has stated that where a defendant is a "member[ ] of the class allegedly excluded from service as grand jury foremen," and the defendant seeks relief under the Equal Protection Clause, she personally has suffered an injury-in-fact, namely "the injuries of stigmatization and prejudice associated with racial discrimination." *Hobby v. United States*, 468 U.S. 339, 347, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984). Thus petitioner's claim is not one of third-party standing. The reasoning of *Brown v. Garcia* is consequently inapplicable here.

Because this Court finds that the petitioner here has first-party standing to contest exclusion of Chinese–Americans from the position of foreperson, it need not decide whether he also has third-party standing to challenge the exclusion of Hispanic–Americans and Filipino–Americans. Petitioner's allegations with respect to the exclusion of Chinese–Americans is enough by itself to satisfy the constitutional standing requirement of injury-in-fact.

Respondent further relies on *Brown v. Garcia* for its holding that Brown also lacked standing because the duties of the grand jury foreperson in California are purely ministerial, and thus discrimination in the selection of that position does not constitute an injury-in-fact to the defendant. *Brown v. Garcia*, 236 F.Supp.2d at 1130. However, this Court find that where, as here, the defendant's claim is one of first-party standing, the ministerial nature of the grand jury foreperson's duties does not serve as a bar to defendant meeting the requirements of standing.

*Brown v. Garcia'* s holding on this issue was based on *Campbell's* discussion of *Hobby v. United States*. There, the petitioner had argued that his conviction should have been reversed under *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), a case in which the court "assume[d] without deciding" that racial discrimination in the selection of Tennessee's grand jury foreperson required reversal of a conviction under the Equal Protection Clause. *Id.* at 551 n. 4, 99 S.Ct. 2993. In Tennessee, the grand jury foreperson was added as the thirteenth member of a grand jury composed of twelve randomly-selected jurors. *Hobby*, 468 U.S. at 348, 104 S.Ct. 3093. The foreperson also had investigatory and administrative powers that were more than ministerial. *Id.* In contrast, the federal grand jury foreperson evaluated in *Hobby*

was chosen from already seated grand jurors and had only ministerial duties. *Id.* at 348, 104 S.Ct. 3093. Thus, *Hobby* held, the petitioner's criminal conviction should not be vacated because the discriminatory exclusion of a federal grand jury foreperson did not affect the racial composition of the jury, and because the foreperson's role was merely ministerial. *Id.* at 344, 104 S.Ct. 3093.

However, *Hobby's* holding was explicitly limited to the context of the defendant's Fifth Amendment due process challenge, and distinguished from the Fourteenth Amendment equal protection challenge in *Rose.* *Hobby,* 468 U.S. at 347, 104 S.Ct. 3093 ("[T]he nature of [Hobby]'s alleged injury and the constitutional basis of his claim distinguish his circumstances from those of the defendants in *Rose.*"). Specifically, the Court found that "discrimination in the selection of federal grand jury foremen cannot be said to have a significant impact upon the *due process* interests of criminal defendants." *Id.* (emphasis added). In contrast, in *Rose,* rather than a harm to the due process right to fundamental procedural fairness, the "defendants had suffered the injuries of stigmatization and prejudice associated with racial discrimination." *Hobby,* 468 U.S. at 347, 104 S.Ct. 3093.

Accordingly, because Chin's claim is based on equal protection, he has alleged that he has suffered a personalized stigmatic injury. Moreover, the harm alleged also constitutes "[an] injury to society as a whole, as well as the stigmatization and prejudice directed against a distinct group, [which] exists regardless of the extent of the grand jury foreman's authority." *Mosley v. Dretke,* 370 F.3d 467, 477 (5th Cir.2004) (citation and quotation marks omitted) (finding that where habeas petition's claim of grand jury foreperson discrimination is based on equal protection,

*Hobby* is inapplicable). *See also Rose,* 443 U.S. at 556, 99 S.Ct. 2993 ("The injury is not only to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts."); *Campbell v. Louisiana,* 523 U.S. 392, 397, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998) (holding that, where discrimination affects a white defendant's grand jury, he suffers an injury in fact because it "casts doubt on the integrity of the judicial process"). Chin's claim thus states that he has suffered a personalized stigmatic harm and the harm of an indictment by a governmental body tainted by discrimination. The power of California's grand jury foreperson consequently is not relevant to his standing in this case. *See Mosley,* 370 F.3d at 477 (equal protection claim does not require consideration of grand jury foreperson's powers); *Johnson v. Puckett,* 929 F.2d 1067, 1071 (5th Cir. 1991).

In summary, plaintiff's alleged injuries to his rights to equal protection constitutes a sufficient harm to satisfy the injury-in-fact requirement and provide him with standing.

**b. Equal Protection Challenge Under § 2254(d)(1)**

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495. Instead, the

court must find that the state court's decision was "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (holding that "clear error" standard did not give state court enough deference when review is conducted under "unreasonable application" clause). Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts may have more leeway. *Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, 2149, 158 L.Ed.2d 938 (2004).

Here, the "governing legal principle" was announced in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). In *Castaneda*, the Court provided that the determination of an equal protection challenge to grand jury selection is governed by a three-part test. The petitioner must show: (1) "the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied;" (2) "the degree of underrepresentation ... by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time;" and (3) "a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." *Id.* 494, 97 S.Ct. 1272. If petitioner makes this showing, then "he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case." *Id.* at 495, 97 S.Ct. 1272.

**1. Prima Facie Case**

■ In this case, it is undisputed that Chin established a prima facie case of discrimination. First, Chinese–Americans are a legally recognized, distinct class. *See, e.g., People v. Lopez*, 5 Cal.Rptr.2d 775, 777 (Cal.App.Super.1991) (use of peremptory challenges to exclude Chinese–Americans from jury violates cross-section requirement). Second, petitioner has made an undisputed statistical showing that no Chinese–Americans had served as grand jury foreperson over a 36–year period, even though they represented 13.4% of the pool of grand jurors from which the foreperson was chosen. Third, the selection process was susceptible to abuse given the judge selected the foreperson after personally observing each prospective juror and that the conversations leading to the selections occurred off the record.

**2. Rebuttal of the Presumption**

■ As petitioner has established a prima facie case of discrimination, the next inquiry is whether the government was successful in rebutting that presumption. A sufficient showing contains more than "affirmations of good faith in making individual selections." *Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). Rather, for the government to rebut the presumption of discrimination the evidence presented must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Id.*

*People v. Chin* agreed with the holding in *People v. Brown* that the government had met its burden by showing that the judges looked to the jurors' leadership and organizational skills as their primary selection criteria. *Chin*, 2002 WL 31402087, *7, 2002 Cal. Unpub. LEXIS at *22 (citing *People v. Brown*, 75 Cal.App.4th at 927, 89 Cal.Rptr.2d 589). The court further found that the evaluation of these criteria was based on factors such as "punctuality, abil-

ity to work with others, and administrative ability." *Id.*

■ Chin's central argument is that the state court finding that the presumption was rebutted is incorrect because the judges themselves did not testify regarding their particular subjective selection criteria. Petition at 17, 23. He further argues that there was no other evidence that the judges' criteria was not race-based. *Id.* This lack of a showing means the government has failed to satisfy its burden, Chin argues, because the testimony of the selector is "an essential pre-requisite" to rebuttal. Petition at 18 n. 17. Chin's argument in this regard fails both for lack of legal and factual support.

First, petitioner's claim that the testimony of the judges was essential to the government meeting its burden finds no basis in law. Petitioner cites several cases for this purported rule; only one—*Castaneda v. Partida*—is the on-point Supreme Court precedent required by section 2254(d)(1). *Castaneda*, however, does not require that the testimony regarding the juror selector's motivations come from any particular individual. Although the Court in that case did find that the presumption was not rebutted, its decision was based on the fact that "the State introduced practically no evidence." *Castaneda*, 430 U.S. at 498, 97 S.Ct. 1272. While the Court remarked that it would have been "useful[ ]" for the juror selectors to testify themselves, it also explained that the utility of such testimony was to illuminate the "procedures followed" in the selection process. *Id.* Here, the government did present evidence regarding the "procedures followed" by offering the testimony of Coleman and Tamony—individuals that participated in the selection process and observed it first hand. *Castaneda* does not support petitioner's proposed rule that testimony from the selectors themselves is a "pre-requi-

site" to the rebuttal of the government's case. *A fortiori*, petitioner cannot demonstrate that the state courts refusal to adopt this erroneous requirement was an "unreasonable application" of "clearly established" Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

Petitioner's citation of *United States v. Perez–Hernandez*, 672 F.2d 1380 (11th Cir. 1982) (per curiam), also is off the mark. In *Perez–Hernandez*, the Eleventh Circuit found that the prima facie case of discrimination was successfully rebutted where the judges involved testified that they used the same administrative criteria that the government argues was relied upon in the case at bar. *Id.* at 1388 (discussing judges criteria, including "leadership and management experiences" and "attentiveness during jury empanelment"). Petitioner is wrong to claim that *Perez–Hernandez* can be read as requiring testimony by the judges themselves. To the contrary, the court stated explicitly that "testimony from the alleged discriminators should be viewed with a great deal of judicial scrutiny." *Id.* at 1387. The case, then, only serves to bolster the state court's assumption in this case that testimony by individuals observing the selectors was more reliable than would have been testimony by the judges themselves.

Second, the factual premises of Chin's argument that the government failed to rebut the presumption are also lacking. While it is true that the judges themselves did not give testimony detailing their subjective selection criteria, there is substantial evidence in the record from other sources as to the criteria used. The court in *People v. Brown* relied on the testimony from Coleman and Tamony stating that race had not been a "selection factor" when they had met with judges about selecting a foreperson, and that instead the judges looked for individuals who were

punctual, had "people skills," and possessed administrative experience. *People v. Brown,* 75 Cal.App.4th at 927, 89 Cal. Rptr.2d 589. The court reasonably found that testimony from these outside observers was even more reliable than would have been testimony from the judges themselves. *Id.* at 926, 89 Cal.Rptr.2d 589. Further, as the court pointed out, different judges had selected the jury forepersons through different methods, thus diminishing the probability that systematic intentional discrimination was behind the ultimate selections. *Id.* Finally, the court relied on the fact that the judges met with Tamony and Coleman, reducing the chance that "any bias the judge might harbor would go unchallenged." *Id.* at 927, 89 Cal.Rptr.2d 589.

Petitioner argues against this reasonable evaluation of the evidence. He contends that since the judges made the ultimate decision, Tamony and Coleman's testimony regarding their recommendations is not relevant. Petition at 23. This Court disagrees. It was entirely reasonable for the state court to rely on the testimony of individuals who had an inside understanding of the judges' selection process, and who gave their informed opinion regarding the factors the judges relied upon. Contrary to petitioner's assertion that there is no evidence in the record as to the judges thoughts, both Tamony and Coleman testified that the criteria they used was not only their own, but it was their understanding that judges looked to the same factors. *See* RT Vol. 4 at 776; Vol. 5 at 974. Moreover, as already mentioned, Tamony and Coleman's testimony regarding their own selection criteria is relevant because the judges relied on their advice in making the final decision.

As discussed more fully below, were this issue presented *de novo* to this Court the facts presented in the government's rebuttal case might warrant a closer inquiry— particularly as to the possibility that the selection process could have been subject to unconscious bias. However, under the narrow scope of review applicable here, this Court cannot find that the state court's evidentiary findings in the application of the Supreme Court's *Castaneda* standard were objectively unreasonable.

### 3. Race- and Gender–Consciousness After 1992

Chin's secondary basis for his attack on the state court's decision is that the evidence presented shows a marked increase in the number of African–American and female[6] forepersons after 1992 and an increase of Chinese- and Hispanic–American forepersons after the denial of his petition. According to Chin, this statistical evidence, coupled with testimony by Coleman that these choices "represented race-conscious selection policies" is enough to grant his petition. Petition at 24. This evidence, while relevant, is not enough for this Court to disturb the state court's decision.

Petitioner argues that the increase in the number of Chinese–Americans selected as foreperson after this challenge was first lodged is proof that the selection process prior to the change was discriminatory. Petition at 19, citing *Hillery v. Pulley,* 563 F.Supp. 1228, 1248 (E.D.Cal.1983). While it is true that this evidence could be read as some proof of prior discriminatory intent, it is not dispositive of the issue. *See Hillery,* 563 F.Supp. at 1248 (calling the magnitude of change after the discriminatory practice "a matter of subjective perception" and finding the evidence to be

---

**6.** The statistics Chin has presented with respect to the increased percentage of women is irrelevant. Chin has not alleged that gender- based discrimination had any role in the selection of his grand jury and the state court did not rule on the issue.

only "further circumstantial evidence of discriminatory intent"). The shift does not necessarily give rise to the inference that the statistics prior to the change must have been the result of invidious discrimination. Instead, it could be read as a sign of the government's recognition that the previously applied race-neutral criteria were creating disparate results, thus necessitating more race-conscious criteria to produce more diverse selections. Accordingly, this Court cannot find that the state court was objectively unreasonable in determining that Chin's evidence of race-conscious selection criteria was insufficient to defeat the government's showing rebutting the presumption of discrimination.

To the extent that petitioner's argument is that race-conscious selection policies targeted towards increasing representation of people of color as grand jury forepersons is an equal protection violation on its own, it still must fail. First, while it may be true that some judges made selections of grand jury forepersons after 1992 with the consideration that people of color should be represented, petitioner cannot claim that this type of race-consciousness had any role in the selection of his foreperson, who was white. Answer at 3. Second, if Tamony's testimony that judges made an effort to include more "people of color" is taken at face value, then such a practice would represent a policy of inclusion—not exclusion. That Chinese–Americans may not have been consciously targeted for inclusion until after women and African–Americans were so targeted does not prove Chinese–Americans had been excluded. Chin cannot argue that under these circumstances the decision in *Rose* requires habeas relief, since that precedent only reaches racially-motivated *exclusion*, *Hobby*, 468 U.S. at 347, 104 S.Ct. 3093 (interpreting *Rose* to apply to defendants who are "members of the class allegedly *excluded* from service as grand jury foremen" (emphasis added)), a fact found not to be the case by the state court here. Chin has not cited any clearly established Supreme Court precedent indicating that race-conscious selections of juror forepersons seeking to increase diversity in that office proves invidious discrimination justifying the strong remedy of habeas relief.

### c. Equal Protection Challenge Under § 2254(d)(2).

■ Chin next asserts that the state court decision also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to petitioner's claim, that was properly presented and made part of the state-court record. *Taylor v. Maddox*, 366 F.3d 992 (9th Cir.2004). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner first argues that *People v. Brown* erred in finding that "race was not discussed as a selection factor" because Tamony and Coleman testified that they had not recalled whether or not it was discussed. Petition at 25. The record shows, however, that both Tamony and Coleman resisted defense counsel's urging to say that race was discussed. Tamony explicitly denied the suggestion. When pressed on the issue, he stated that race "may have come up" but "not for the reason for choosing someone. . . ." RT, Vol. 4 at 752. Coleman also was fairly clear that

he didn't believe race was discussed. He testified that:

> I can't specifically recall an instance where race was mentioned as a race—you know, that this person should be picked because of this person's race. The topic of race in general might have come up in some discussions with judges around this, but I don't recall a specific instance in the picking of a foreman where a judge made a remark about race.

RT. Vol. 5 at 985. This Court finds that the state court was not unreasonable to view this testimony to support the conclusion that race was not discussed. Moreover, even if petitioner were right that the state court should have characterized the relevant testimony as stating that the witnesses "couldn't recall" whether race was discussed, such an error would not be of the magnitude of the "highly probative, relevant evidence" that justifies relief under section 2254(d)(2).

Next, petitioner questions the state court's "assumption that race would have been discussed if there was a discriminatory purpose.…" Petition at 25. In doing so, petitioner seeks to recharacterize his legal arguments as factual ones. The state court did not make a finding that race would have been discussed if there was a discriminatory purpose. Instead it reasonably weighed Tamony and Coleman's testimony as reliable evidence that the government rebutted the presumption of discrimination. *People v. Brown*, 75 Cal.App.4th at 927–28, 89 Cal.Rptr.2d 589.

Accordingly, petitioner's claims for relief under § 2254(d)(2) must fail.

## VII. CONCLUSION

Constrained by the narrow standard of review applicable to this habeas setting, this Court cannot conclude that the state court's judgment involved an "unreason-able application" of "clearly established Federal law, as determined by the Supreme Court of the United States" or that it was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Nonetheless, were this matter presented to this Court for *de novo* review, the Court would feel compelled to scrutinize the state court's finding more closely. The statistical evidence of the pattern of exclusion—the fact that no Chinese–Americans, Filipino Americans or Latinos had been chosen as grand jury foreperson for 36 years from 1960 to 1996—raises a strong inference that the selection process may not have been race-neutral. Indeed, as noted above, Chin presented expert evidence that the chance of a random selection system not choosing any person from these groups over a 36–year period is just .0003%. Even if the methodology of the statistical analysis were subject to challenge, the stark reality of the actual number chosen—zero—is plain. *Cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340, 342 n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (probative value of statistics as to discrimination varies with all surrounding facts and circumstances; where numbers are tantamount to the "inexorable zero," inference of discrimination may be irrebutable).

As noted above, the Superior Court's executive director and assistant district attorney testified that race was not an explicit factor in the selection process and that the presiding judges applied race neutral criteria, looking for those members with, e.g., "leadership" experience, "people skills," and the capacity to motivate others to work together. However, even if one were to assume, as this Court does, that the testimony in state court was credible and that those involved in the selection of grand jury foreperson acted with the nob-

lest intentions, the compelling pattern of exclusion suggests there may be more to the selection process than meets the eye. A closer examination is warranted.

The complete absence of grand jury forepersons of Chinese, Filipino or Latino descent over a 36-year period begs the question whether unconscious stereotyping or biases may have contributed to the exclusion of these groups notwithstanding the best of intentions of those involved. The risk lies in the subjectivity of the selection process. Although assessing potential candidates for qualities of "leadership" and "people skills" is entirely rational, such subjective judgments entail subtle and unconscious mental processes susceptible to bias. A number of courts have recognized that subjective decision-making allows for subtle biases or unconscious stereotyping to affect selection processes. *See, e.g., Lynn v. Regents of the Univ. of California,* 656 F.2d 1337, 1343 & n. 5 (9th Cir.1981) (where decision is "highly subjective" courts should "scrutinize attitudes and motivation" to determine if discriminatory stereotypes affected the selection process); *Stender v. Lucky Stores, Inc.,* 803 F.Supp. 259, 321 (N.D.Cal.1992) (employer's failure to articulate and apply objective criteria reinforces unconscious prejudice). The Ninth Circuit has observed that some subjective selection processes, "though harmless in appearance, may hide subconscious [discriminatory] attitudes," *EEOC v. Inland Marine,* 729 F.2d 1229, 1236 (9th Cir.1984), *cert. denied,* 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984) (citations omitted), and that "racial stereotypes often infect our decision-making processes only subconsciously." *Gonzalez-Rivera v. INS,* 22 F.3d 1441, 1450 (9th Cir.1994). *See also United States v. Bishop,* 959 F.2d 820, 826–28 (9th Cir.1992) (juror's area of residence was not a valid racially-neutral justification for peremptory challenge because court found it to be "a stereotypical racial reason"); *Bush v. Commonwealth Edison Co.,* 990 F.2d 928, 931–32 (7th Cir.1993) (evidence that employer's subjective determinations "reflected unconscious racial bias"); *Georgia v. McCollum,* 505 U.S. 42, 68, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (O'Connor, J., dissenting) ("It is by now clear that conscious and unconscious racism can affect the way white jurors perceive minority defendants and the facts presented at their trials, perhaps determining the verdict of guilt or innocence."); *State v. Tucker,* 226 Conn. 618, 629 A.2d 1067, 1077–1078 (1993) ("unconscious racial stereotype" may affect jury evaluation of defendant or witnesses).

A growing body of social science recognizes the pervasiveness of unconscious racial and ethnic stereotyping and group bias. *See* Charles Lawrence, *The Id, The Ego, and Equal Protection: Reckoning with Unconscious Racism,* 39 Stan. L.Rev. 317 (1987); Mari Matsuda, *Voices of America: Accent, Antidiscrimination Law, and a Jurisprudence for the Last Reconstruction,* 100 Yale. L.J. 1329 (1991); Edward M. Chen, *The Judiciary, Diversity, and Justice for All,* 91 Cal. L.Rev. 1109, 1119 n. 51 (2003) (studies cited therein). There is also increasing recognition of the natural human tendency to categorize information and engage in generalizations, of which stereotyping is a part, as a means of processing the huge amount of information confronting individuals on a daily basis; these unconscious processes can lead to biased perceptions and decision-making even in the absence of conscious animus or prejudice against any particular group. *See* Eric K. Yamamoto, Susan K. Serrano, et al., *Dismantling Civil Rights: Multiracial Resistance and Reconstruction,* 31 Cumberland L.Rev. 523, 562–65 (2000); Linda Krieger, *The Content of Our Categories: A Cognitive Bias Approach to Discrimination and Equal Employment Op-*

*portunity*, 47 Stan. L.Rev. 1161 (1995); John Barth, *Conditional Automaticity: Varieties of Automatic Influence in Social Perception and Cognition, in Unintended Thought* 3 (James S. Uleman & John A. Bargh, eds., 1989).

Looking beyond the compelling statistical evidence of exclusion, this Court takes note that many of the facially neutral criteria used by those participating in the selection process echo the negative stereotypes that have long plagued Asian–Americans and others. Asian–Americans have been particularly vulnerable to stereotyping and exclusion when subjective selection criteria center on "leadership" and "people skills." The Federal Glass Ceiling Commission, created pursuant to the 1991 Civil Rights Act, documents that Asian–Americans are "seriously underrepresented" in management positions, in part because they are widely stereotyped as "passive," and "unassertive," as well as "more equipped for technical than people-oriented work and therefore not leadership material." Federal Glass Ceiling Commission, *Good for Business: Making Full Use of the Nation's Human Capital*, 104, 106 (1995), *available at* http://www. dol.gov/asp/programs/history/reich/reports/ceiling.pdf; *see also* Deborah Woo, *Glass Ceilings: A Wake–Up Call for Asian Americans?, in The New Face of Asian Pacific America: Numbers, Diversity and Change in the 21st Century* (Eric Lai & Dennis Arguelles eds., 2003); Grace W. Tsuang, Note, *Assuring Equal Access of Asian Americans to Highly Selective Universities*, 98 Yale L.J. 659, 663–665 (1989) (reviewing examples of admissions officers at prestigious colleges applying unsupported stereotypes about Asian–Americans lacking leadership qualities); Joyce Tang, *The Model Minority Thesis Revisited: (Counter)evidence From the Science and Engineering Fields*, 33 J. Applied Behavioral Sci. 291 (1997) (Asian–Americans are less likely than whites to be in management positions after controlling for educational credentials, age, and other factors).[7] As one commentator explains:

> Asian Americans, for instance, have been described as nonassertive and deferential, intelligent but devious, and mathematically and technically oriented rather than verbally skilled.

. . . . .

The perceived incompatibility of Asian Americans in managerial and executive roles and as lawyers exemplifies the restrictive impact of stereotyping. Some employers apparently believe that Asian Americans do not make good managers because they presumably lack skills associated with leadership. These employers view Asian Americans as insufficiently aggressive, not politically astute, or interpersonally weak.

. . . . .

Pat Chew, *Asian Americans: The "Reticent" Minority and Their Paradoxes*, 36 Wm. & Mary L.Rev. 1, 38–40 (1994).

As a specific example of the risk of unconscious bias, Mr. Coleman testified that he and the judges looked for those with "people skills" and who weren't "withdrawn;" he gave as an example of the ideal foreperson an individual who he described as "[a] friendly . . . hardy handshake sort of guy." RT Vol. 5 at 975, 995, 1004.

---

**7.** Women have been subjected to similar stereotypes. *See Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 57 (1st Cir.1999), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000) (the stereotypic assumption that "women are not aggressive" along with other "more subtle cognitive phenomena" may infect decision-making). *Cf. Price Waterhouse v. Hopkins,* 490 U.S. 228, 235–236, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (notions of how women are expected to behave in the workplace based on sex-based stereotypes).

These criteria, while not irrational in and of themselves, lay in contradistinction to the widely held images of Asians who are often perceived as quiet and unassuming. *See* Helen Zia, *Asian American Dreams,* at 119 (2000) (describing Asian stereotypes as subservient, ineffectual, emasculated); Keith Aoki, *"Foreign-ness" & Asian American Identities: Yellowface, World War II Propaganda, & Bifurcated Racial Stereotypes,"* 4 Asian Pac. Am. L. J.1, 46 (1996) (Asian professionals are imputed with technical expertise and predilections to passivity and unassertiveness).

There is, therefore, a sizeable risk that perceptions and decisions made here may have been affected by unconscious bias. *Cf. Batson v. Kennedy,* 476 U.S. 79, 106, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (Marshall, J., dissenting) ("A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically."). While it is not possible to reach any conclusion whether unconscious bias infected the selection process here, it seems that it would have been appropriate to further scrutinize the motivations that lay behind the criteria applied.

Nonetheless, given the narrow scope of review applicable to federal habeas proceedings, the Court is constrained to deny the petition. This Court cannot conclude the state court decision denying Chin's petition was contrary to clearly established federal law as determined by the U.S. Supreme Court, particularly since the problem of unconscious bias has not yet been directly addressed by the that Court. Nor can this Court conclude based on the evidence presented to the state court that its decision was based on an "unreasonable determination of facts" since respondent produced substantive, probative evidence

in rebuttal, and petitioner's claim was based solely on generalized statistics. Consequently, the petition for writ of habeas corpus is DENIED.

**IT IS SO ORDERED.**