[No. C062495. Third Dist. Mar. 27, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
FAUSTINO NIETO ROMERO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II through VI.

**COUNSEL**

Madeline McDowell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**NICHOLSON, J.**—Defendant Faustino Nieto Romero murdered Javier Aguilar and Charles Smythe and committed several other crimes. Convicted by jury of those crimes and sentenced to two terms of life without possibility of parole and various other terms, defendant appeals.

On appeal, defendant contends (1) the trial court erred by denying his motion to quash the grand jury indictment; (2) the trial court erred by denying his motion to suppress statements he made to detectives concerning the Smythe murder; (3) the trial court erred by denying his request to have the jury instructed with a modified version of CALCRIM No. 358; (4) the trial court erred by admitting evidence of statements defendant made to his wife concerning the two murders; (5) there was insufficient evidence of territorial jurisdiction over crimes he committed in Mexico; and (6) he was denied his constitutional right to a jury trial on territorial jurisdiction.

Finding no prejudicial error, we affirm.

## FACTS

The facts of this case can be divided into three sets: (1) the Aguilar murder and related crimes, (2) the Smythe murder and related crimes, and (3) crimes committed against Liliana, defendant's wife at the time.

### Aguilar Murder and Related Crimes

Norteño gang member Ernesto Zaragoza was shot in the head on March 10, 2001, presumably by a Sureño gang member. As a result, several Norteños decided to shoot a Sureño, particularly targeting Heriberto (Eddie) Gomez.

On March 11, 2001, Mike Perez and defendant, who associated with the Norteños, drove to the area of Sixth Street in Woodland, a known Sureño hangout. Both were armed with .38 revolvers. They parked and walked toward a group of men, including Gomez, Ricardo Aguilar, Javier Aguilar, and Leandro Escarsega, and opened fire. Gomez was shot in the face by Perez. Defendant walked up to Gomez, who was on the ground, and shot him point blank in the head. Gomez survived, as did Ricardo Aguilera, who was shot in the shoulder. Javier Aguilar, however, was shot in the arm and chest and died as a result.

Soon after the Aguilar murder, defendant traveled to Florida with his girlfriend Ana Barragan. During their trip, defendant told Barragan that he was involved in the Sixth Street shootings.

### Smythe Murder and Related Crimes

After defendant returned to Woodland from Florida, Raul Ramos (a local Norteño shot caller) and Michael Raquel (Ramos's methamphetamine supplier) hired defendant to kill Charles Smythe, who was selling methamphetamine in competition with Raquel. Defendant agreed to kill Smythe for

$15,000, plus whatever money and drugs Smythe had. Ramos and Raquel showed defendant where Smythe lived in Gridley, and Ramos gave defendant guns to use.

On April 18, 2001, Smythe and his fiancée, Raquel Addison, were arguing at their residence, and Addison went outside. Defendant approached her, grabbed her, put a gun to her head, and threatened her. He took Addison inside to where Smythe was. He had Smythe lie on the floor and ordered Addison to tie him up.

In response to defendant's demands for money and drugs, Smythe said he did not have drugs but money was in the car. Addison retrieved the money from the car, and defendant put it in his jacket pocket.

Defendant tied up Addison and drove Smythe away from the residence. Defendant told Addison not to call the cops or he would kill Smythe.

Defendant drove Smythe to a rural road near Woodland. He got Smythe out of the car and had him lie down in the road. Defendant shot Smythe in the back, but Smythe jumped up and tried to run away. Defendant's gun jammed, so he chased down Smythe and cut his throat.

Defendant went to Ramos's home, where he told Ramos what he had done. Ramos paid defendant, and defendant said he was leaving for Mexico.

### Crimes Against Liliana

Defendant appeared at the home of his estranged wife, Liliana, late at night and announced that they were going to Mexico. Liliana and defendant had discussed moving to Mexico, and she had prepared, but she did not want to go that night. Defendant grabbed their child, put her in the car, and threatened to take her away from Liliana if Liliana did not accompany him. Liliana decided to go because she did not want to be separated from her daughter. Defendant grabbed Liliana by the arm and put her in the car.

The family eventually arrived in Mexico. While there, defendant told Liliana about the Aguilar and Smythe murders.

Liliana had opportunities to obtain help from others, but she did not know where she was in Mexico and she was afraid of what defendant would do if

she tried to flee. Defendant beat Liliana at times and forced her to have sex with him against her will.

Around June 2001, defendant took Liliana to her grandmother's home in Mexico and allowed her to return to California.

Before his arrest defendant told Ramos and Casimir Vargas about how he had committed the Sixth Street shootings. He also told Vargas about how he had committed the Smythe murder and related crimes. He described the crimes to his longtime friend, Xavier Cardona, and Cardona's wife, Gloria Anaya-Corona.

## PROCEDURE

A grand jury issued an indictment charging defendant with following crimes:

—Count 1: murder of Javier Aguilar (Pen. Code, § 187, subd. (a)), with special circumstances: financial gain (Pen. Code, § 190.2, subd. (a)(1)), multiple murders (Pen. Code, § 190.2, subd. (a)(3)), and furthering the activities of a criminal street gang (Pen. Code, § 190.2, subd. (a)(22));

—Count 2: attempted murder of Heriberto Gomez (Pen. Code, §§ 187, subd. (a), 664, subd. (a));

—Count 3: attempted murder of Ricardo Aguilar (Pen. Code, §§ 187, subd. (a), 664, subd. (a));

—Count 4: attempted murder of Leandro Escarsega (Pen. Code, §§ 187, subd. (a), 664, subd. (a));

—Count 5: omitted from the indictment;

—Count 6: murder of Charles Smythe (Pen. Code, § 187, subd. (a)), with special circumstances: kidnapping for robbery (Pen. Code, § 190.2, subd. (a)(17)(B)), robbery (Pen. Code, § 190.2, subd. (a)(17)(A)), kidnapping (Pen. Code, § 190.2, subd. (a)(17)(B)), burglary (Pen. Code, § 190.2,

subd. (a)(17)(G)), multiple murders (Pen. Code, § 190.2, subd. (a)(3)), and furthering the activities of a criminal street gang (Pen. Code, § 190.2, subd. (a)(22));

—Count 7: kidnapping for robbery (Pen. Code, § 209, subd. (b)(1));

—Count 8: first degree robbery of Charles Smythe (Pen. Code, §§ 211, 212.5, subd. (b));

—Count 9: kidnapping of Charles Smythe (Pen. Code, § 207, subd. (a));

—Count 10: first degree burglary (Pen. Code, § 459);

—Count 11: assault with a firearm on Raquel Addison (Pen. Code, § 245, subd. (a)(2));

—Count 12: kidnapping of Liliana (Pen. Code, § 207, subd. (a));

—Count 13: false imprisonment with force or violence (Pen. Code, §§ 236, 237, subd. (a));

—Count 14: infliction of corporal injury on the parent of defendant's child (Pen. Code, § 273.5, subd. (a));

—Count 15: infliction of corporal injury on the parent of defendant's child (Pen. Code, § 273.5, subd. (a));

—Count 16: infliction of corporal injury on the parent of defendant's child (Pen. Code, § 273.5, subd. (a));

—Count 17: spousal rape (Pen. Code, § 262, subd. (a)(1));

—Count 18: spousal rape (Pen. Code, § 262, subd. (a)(1));

—Count 19: dissuading a witness (Pen. Code, § 136.1, subd. (c)(1)).

The indictment also charged enhancements in connection with the various crimes, including commission of the offenses for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)) and use and discharge of a firearm (Pen. Code, § 12022.53).

After the presentation of evidence to the jury in the guilt phase of the trial, the trial court granted defendant's motion to dismiss one of the spousal rape counts (count 17).

The jury hung on counts charging kidnapping of Liliana (count 12), spousal rape (count 18), and dissuading a witness (count 19).

The jury found defendant not guilty of one of the counts alleging infliction of corporal injury (count 15) and that the gang special circumstances and enhancements were untrue as to the Smythe crimes. The jury found defendant guilty on the remaining counts and found true the remaining special circumstances and enhancements.

After a penalty phase, the jury chose life without possibility of parole for the murders.

As defendant does not raise sentencing contentions on appeal, we need not set forth the sentence in detail. The trial court sentenced defendant to (1) a determinate term of six years eight months, (2) an indeterminate term of 40 years to life, and (3) two indeterminate terms of life without possibility of parole.

## DISCUSSION

## I

### *Minority Representation on Grand Juries*

Defendant contends that the process for selecting the grand jury that indicted him violated his Sixth Amendment right to have a jury drawn from a representative cross-section of the community and his Fourteenth Amendment right to equal protection. Based on these contentions, he asserts the trial court should have granted his motion to quash the indictment handed down by the grand jury. We conclude that the grand jury selection process violated neither his Sixth Amendment nor his Fourteenth Amendment right.

After (A) a brief description of grand jury eligibility and how statistics are used to measure disparities in minority group representation on grand juries, (B) a summary of the law concerning minority representation on grand juries, and (C) a summary of the proceedings on defendant's motion to quash the indictment, we (D) consider, and find no merit in, defendant's assertions that (1) based on our earlier issuance of an alternative writ in this case, the law of the case doctrine governs whether defendant made a prima facie showing of violations of the Sixth Amendment (jury drawn from representative cross-section of community) and Fourteenth Amendment (equal protection), (2) defendant made a prima facie showing of violations of the Sixth and Fourteenth Amendments by introducing evidence of systematic exclusion of

Hispanics and Asian-Americans from grand juries, and (3) the prosecution's rebuttal evidence was flawed and did not sufficiently rebut the prima facie showing.

### A. Statistical Measures and Eligibility to Serve on a Grand Jury

Disparities between the percentage of a minority group in the community and the percentage of that minority group on grand juries often lead to the claim that the grand jury selection process is constitutionally flawed. Before reviewing the law concerning these claims and the facts of this case, we briefly discuss some of the statistical measures of disparity.

The initial measure of disparity, and one often favored by courts, is *absolute disparity*. (*U.S. v. Torres-Hernandez* (9th Cir. 2006) 447 F.3d 699, 703.) This measures the difference between the proportion of the cognizable minority group in the community and the proportion of that group on grand juries. For example, if "Minority A" makes up 20 percent of the population in the relevant community but only 15 percent of grand jurors, the absolute disparity is 5 percent (20 minus 15 equals 5).

The results of this analysis of minority group representation can be affected by whether the analyst uses raw population numbers or considers eligibility to serve on a grand jury.

To serve on a grand jury, a person must (1) be a citizen of the United States, (2) be 18 years or older, (3) have been a resident of the county for one year immediately before serving, (4) have natural faculties, ordinary intelligence, sound judgment, and fair character, and (5) have sufficient knowledge of the English language. (Pen. Code, § 893, subd. (a).) Several characteristics disqualify a person, otherwise qualified, from grand jury service: (1) current service as a trial juror, (2) discharge as a grand juror within one year prior to current service, (3) conviction of any felony or malfeasance in office, and (4) current service as an elected public officer. (Pen. Code, § 893, subd. (b).)

Some of these qualifications tend to reduce the number of minorities eligible for grand jury service, such as citizenship and English language proficiency. Therefore, even though Minority A may constitute 20 percent of the total population in our hypothetical, jury-eligible members of Minority A may constitute only 18 percent of the jury-eligible population. Therefore, again assuming that Minority A makes up 15 percent of grand juries, the absolute disparity is only 3 percent (18 minus 15 equals 3), which is less than the absolute disparity when raw population figures are used.

Another measure of disparity is *relative (or comparative) disparity*. This measure relates the size of the absolute disparity to the percentage of

minority group members in the population. For example, in our hypothetical using jury-eligible members of Minority A, the relative disparity is approximately 17 percent, which is determined by dividing the absolute disparity (3 percent) by the percentage of jury-eligible members of Minority A in the community (18 percent).

The relative disparity can vary widely from the absolute disparity. For example, if Minority B comprises 45 percent of the community and has an absolute disparity of 3 percent on grand juries, the relative disparity is only about 7 percent (3 percent divided by 45 percent equals about 7 percent). On the other hand, if Minority C comprises 3 percent of the community and has an absolute disparity of 3 percent on grand juries, the relative disparity is 100 percent (3 percent divided by 3 percent equals 100 percent). In the Minority C hypothetical, the small minority is unrepresented on grand juries; thus, the 100 percent underrepresentation.

The smaller the minority group is, the less reliable the measure of underrepresentation. That is because there may not be enough members of the small minority group to make the test statistically significant. Larger minority groups provide more reliable measures of underrepresentation. In addition to the size of the minority group, there are other matters, beyond the scope of this summary, that affect statistical significance.

Finally, *impact* calculates the difference between (1) how many members of a specific minority group would serve on the grand jury if it perfectly reflected the proportion of that minority group in the community and (2) how many members of the minority group actually served. Therefore, if Minority D comprises 20 percent of the community, the impact analysis would predict that 3.8 out of 19 grand jurors would be from Minority D. On a grand jury with two jurors from Minority D, the impact would be an underrepresentation of 1.8 jurors.[1]

### B. *Law Concerning Minority Representation on Grand Juries*

#### 1. *Sixth Amendment Fair Representation Claim*

In *People v. Horton* (1995) 11 Cal.4th 1068, 1087–1088 [47 Cal.Rptr.2d 516, 906 P.2d 478] (*Horton*), the Supreme Court summarized the relevant legal inquiry when a defendant claims a jury is not drawn from a representative cross-section of the community. "Although that decision concerned petit juries, the same standard applies in evaluating the composition of grand

---

[1] See Weeks, *Jury Representativeness: Challenging the Array* Handbook of Jury Research (ALI, Abbott & Batt edits., 1999) section 7.05, pages 7-20 to 7-25, for a discussion of how statistics are used in a grand jury challenge.

juries. (*Vasquez v. Hillery* (1986) 474 U.S. 254, 261–262 [88 L.Ed.2d 598, 106 S.Ct. 617].)" (*People v. Burney* (2009) 47 Cal.4th 203, 225 [97 Cal.Rptr.3d 348, 212 P.3d 639] (*Burney*).)

■ The *Horton* court stated (also quoted more recently in *Burney*): "Under the federal and state Constitutions, an accused is entitled to a jury drawn from a representative cross-section of the community. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *Duren* v. *Missouri* (1979) 439 U.S. 357, 358–367 [58 L.Ed.2d 579, 583–588, 99 S.Ct. 664]; *People* v. *Howard* (1992) 1 Cal.4th 1132, 1159 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) That guarantee mandates that the pools from which juries are drawn must not systematically exclude distinctive groups in the community. (*People* v. *Mattson* (1990) 50 Cal.3d 826, 842 [268 Cal.Rptr. 802, 789 P.2d 983].) 'In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' ([*Duren,*] *supra,* 439 U.S. at p. 364 . . . ; [citation].) The relevant 'community' for cross-section purposes is the judicial district in which the case is tried [(here, the county)]. (*People* v. *Mattson, supra,* 50 Cal.3d at p. 844; *Williams* v. *Superior Court* (1989) 49 Cal.3d 736, 744–745 [263 Cal.Rptr. 503, 781 P.2d 537].) If a defendant establishes a prima facie case of systematic underrepresentation, the burden shifts to the prosecution to provide either a more precise statistical showing that no constitutionally significant disparity exists or a compelling justification for the procedure that has resulted in the disparity in the jury venire. (*People* v. *Sanders* (1990) 51 Cal.3d 471, 491 [273 Cal.Rptr. 537, 797 P.2d 561].)" (*Horton, supra,* 11 Cal.4th at pp. 1087–1088.)

Statistical evidence of a disparity does not meet the burden of demonstrating that the underrepresentation was due to systematic exclusion. A defendant must also establish that the disparity is the result of an improper feature of the jury selection process. (*People v. Howard, supra,* 1 Cal.4th at p. 1160.) "When a county's jury selection criteria are neutral with respect to race, ethnicity, sex, and religion, the defendant must identify some aspect of the manner in which those criteria are applied (the probable cause of the disparity) that is constitutionally impermissible. (*People* v. *Sanders, supra,* 51 Cal.3d at p. 492; *People* v. *Bell*[ (1989)] 49 Cal.3d [502,] 524 [262 Cal.Rptr. 1, 778 P.2d 129].)" (*Horton, supra,* 11 Cal.4th at p. 1088, italics omitted.)

### 2. *Fourteenth Amendment Equal Protection Claim*

■ To make a prima facie showing that underrepresentation of a minority group on the grand jury violates a defendant's Fourteenth Amendment right

to equal protection, defendant must: "(1) show that the excluded group is a cognizable class; (2) demonstrate a degree of underrepresentation given the proportion of the excluded group in the total population compared to the proportion called to serve as grand jurors over a significant period of time; and (3) show that the selection procedure is susceptible of abuse or is not racially neutral to bolster the presumption of discrimination raised by the statistical disparity. (*Castaneda* v. *Partida*[ (1977)] 430 U.S. [482,] 494–495 [51 L.Ed.2d 498, 97 S.Ct. 1272].)" (*People v. Brown* (1999) 75 Cal.App.4th 916, 924 [89 Cal.Rptr.2d 589]; see *People v. Garcia* (2011) 52 Cal.4th 706, 738–739 [129 Cal.Rptr.3d 617, 258 P.3d 751].)

### C.  *Proceedings on Motion to Quash Indictment*

Defendant joined codefendant Michael Raquel's motion to quash the indictment. They claimed that the indictment, which was handed down by the grand jury in the 2001–2002 term, should be quashed. The parties argued concerning the proper period of time that should be considered for the purpose of the motion, defendant arguing that the court should use the 20-year period from 1985 to 2004 and the prosecution arguing that the court should use the seven-year period from 1995 to 2001. The trial court selected the seven-year period from 1995 to 2001 because substantial changes were made in the manner of selecting a grand jury in 1995 and the indictment was handed down by the grand jury chosen in 2001. Although the trial court settled on the seven-year period as the most relevant, it stated that it would allow evidence encompassing a longer timeframe.

Defendant argued that, in addition to the minority group of Hispanics, the court should consider the underrepresentation of Asians/Pacific Islanders on the grand juries. The trial court denied the defense's motion to consider underrepresentation of Asians/Pacific Islanders because it concluded that Asians/Pacific Islanders are not a cognizable group for purposes of the representative cross-section analysis.

Codefendant Raquel petitioned for a writ of mandate from this court on the cognizable group issue, and this court, by way of a *Palma*[2] notice, encouraged the trial court to hear evidence concerning whether Asian-Americans are a cognizable group. (*Raquel v. Superior Court* (Aug. 27, 2007, C056036).) Thereafter, the court heard testimony from Dr. Stanley Sue, a psychology and Asian-American studies expert, on that issue—that is, whether Asian-Americans, grouped with or without Pacific Islanders, are a cognizable group. After hearing Dr. Sue's testimony, the trial court ruled that Asian-Americans

---

[2] *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893].

are not a cognizable group for the purpose of the motion to quash the indictment. The hearing on the motion was therefore limited to whether Hispanics were underrepresented on grand juries from 1995 to 2001.

Dr. Jerome Braun testified as an expert on statistics for the defense during the hearing on the motion to quash the indictment. He prepared analyses of the composition of the Yolo County grand juries for two time periods: (1) seven years (terms), from 1995 to 2001, and (2) 20 years (terms), from 1985 to 2004. To prepare the analyses, he relied on (1) population estimates from California's Department of Finance showing age, sex, and ethnicity only, (2) data from the Yolo County Jury Commissioner, and (3) public information concerning the grand juries. He analyzed the participation of Hispanics serving on the grand jury as compared to the Department of Finance's estimates of Hispanics in Yolo County who are 18 years and older.

Using these numbers, Dr. Braun calculated that in the 20-year period (20 grand jury terms), from 1985 to 2004, the mean absolute disparity of Hispanic grand jurors was 11.2 percent, with a relative disparity of 56.5 percent. The impact was that there would have been an average of 2.2 more Hispanics each term if their proportion in the population were reflected on the grand jury. (The average number of grand jurors per year during this period was 19.75.) Dr. Braun concluded that the odds of this Hispanic underrepresentation occurring by a random draw are nearly nonexistent, as much as 5,000,000 to one.[3]

Using the same sources but limiting the period to seven years (terms), from 1995 to 2001, Dr. Braun calculated that the average absolute disparity of Hispanic grand jurors was 9.5 percent, with a relative disparity of 43.5 percent. The impact was that Hispanics were underrepresented by an average of two jurors. (The average number of grand jurors per year during this period was 21.) Dr. Braun concluded that the odds of this Hispanic underrepresentation occurring by a random draw are between 50 to one and 544.5 to one.

On cross-examination, Dr. Braun admitted that, in determining which Hispanics in Yolo County are eligible for grand jury service, he considered age and Hispanic surname only. He did not have the data to also consider citizenship, residence in the county for at least one year, prior felony convictions, and sufficient knowledge of English.

The testimony of Robyn Weaver, the Yolo County Jury Commissioner, from another case concerning how grand juries are selected, was admitted as

---

[3] Dr. Braun also provided statistics relating to Hispanics who were applicants and nominees.

an exhibit in this case. Under the supervision of the judges, she manages the process of selecting grand jurors.

The current system for recruiting potential grand jurors was adopted in 1995. Before then, Weaver used the system for selecting petit juries, which entailed sending notices to a random draw of individuals on voter registration and Department of Motor Vehicle lists. That system was abandoned in favor of a system that could more easily obtain ethnic and geographical diversity on the grand jury.

Since 1995, potential grand jurors are recruited in several ways: (1) inquiries to the superior court judges and court commissioners for suggestions; (2) letters to the members of the county board of supervisors; (3) press releases to several local newspapers within Yolo County; (4) inquiries to community service organizations, including Hispanic and Asian organizations; (5) lists of individuals who served on petit juries; (6) publication in local newspapers of each year's grand jury final report along with information on how to apply to be a grand juror; (7) posting of a pamphlet on grand jury service in the petit jury assembly room; and (8) approaching current grand jurors to determine whether they are willing to serve another term.

Weaver tries each term to obtain a diverse pool of potential grand jurors by reaching out to those with ethnic-sounding names (such as Hispanic, Asian, Indian, and Russian names) and to all geographic areas of the county.

When she gets a response concerning a potential grand juror, regardless of the source, Weaver sends an application to the person, along with a pamphlet concerning grand jury service. She reviews returned applications for legal eligibility to serve on the grand jury and whether the application is properly filled out. After this review, she contacts each eligible applicant and sets up an interview with a superior court judge.

There have been times when, in response to Weaver's call to set up an interview and even after that point in the process, an applicant has stated that, because of a hardship involving the time commitment, the applicant is not able to serve. In those circumstances, Weaver makes a notation on the application and removes that applicant from the list of interviewees or from the draw of grand jurors. The applicant is not asked to sign a statement supporting the hardship.

The superior court judges and, occasionally, the court commissioners, conduct the interviews of the eligible applicants—eligibility being determined by the applicant's responses on the application. The judge or commissioner makes a determination about whether an interviewee should be placed in the

grand jury draw. For example, one interviewee was rejected by a judge because the interviewee had "his own political agenda." However, most interviewees are approved for inclusion in the grand jury draw.

The names of the remaining potential grand jurors (nominees) are put into a box and 19 names are drawn randomly to constitute the grand jury, as required by Penal Code sections 906 and 908. After the grand jury is chosen, alternates are chosen in the same manner.

After further argument and briefing, the trial court denied the motion to quash the indictment without comment. However, this court, responding to a new writ petition, issued an alternative writ of mandate directing the trial court to show cause why it should not be required to reverse its determination concerning the cognizability of Asian-Americans as a minority group and to hear rebuttal evidence on the issue of Hispanic underrepresentation. (*Romero v. Superior Court* (Dec. 9, 2008, C059666); *Raquel v. Superior Court* (Dec. 9, 2008, C059385).) The trial court therefore held a hearing to receive evidence concerning Asian-American underrepresentation and also to receive rebuttal evidence from the prosecution concerning Hispanic underrepresentation.

Concerning Asian-American representation on grand juries in Yolo County, Dr. Braun testified that he based his study on the same sources he used in evaluating Hispanic representation on grand juries.

In 14 of the 20 years from 1985 to 2004, Dr. Braun identified no Asian-Americans as having served on the grand juries. The mean absolute disparity for Asian-American representation on grand juries was 5.9 percent with a mean relative disparity of 66.8 percent. The impact was that Asian-Americans were underrepresented by an average of 1.2 jurors.

Dr. Braun's seven-year analysis (1995 to 2001) concluded that the mean absolute disparity for Asian-Americans on grand juries was 7.7 percent, with a relative disparity of 76.7 percent. The impact of the disparity was that Asian-Americans were underrepresented on grand juries by an average of 1.6 grand jurors each term.

The trial court again denied the motion to quash the indictment. It found that the disparities in Hispanic and Asian-American participation on grand juries was "constitutionally insignificant."

D. *Defendant's Contentions on Appeal*

1. *Law of the Case*

Defendant contends that the issue of whether he made a prima facie showing of Hispanic underrepresentation on grand juries was decided in a

prior writ proceeding in this court and is therefore law of the case now. He is mistaken. The law of the case doctrine does not apply when there is no opportunity for oral argument and no written decision.

On August 14, 2008, defendant filed a petition for writ of mandate, seeking an order requiring the trial court (1) to set aside its determination that Asian-Americans are not a cognizable class and to conduct further proceedings on that issue and (2) to hear rebuttal evidence from the prosecution concerning the claim of Hispanic underrepresentation on grand juries. We issued an alternative writ of mandate, directing the trial court to grant the requested relief or show cause why it has not done so. The trial court granted the relief requested in the petition; therefore, the alternative writ was discharged and the petition dismissed as moot, without an opportunity for oral argument and without a written opinion.

■ "The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . , and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.' [Citations.]" (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892–893 [12 Cal.Rptr.2d 728, 838 P.2d 250].) The law of the case doctrine applies to matters decided in a pretrial writ proceeding in an appellate court if (1) the matter was fully briefed, (2) there was an opportunity for oral argument, and (3) the cause was decided by written opinion. (*Id.* at p. 894.)

In the pretrial writ proceeding at issue here, there was no opportunity for oral argument and we did not issue a written opinion. Acknowledging the absence of these elements, defendant nonetheless claims that we should treat the order issuing the alternative writ as law of the case. For this claim, he offers neither argument nor authority. We therefore reject the assertion that the law of the case doctrine applies here.

### 2. *Prima Facie Showing*

Having concluded that the law of the case doctrine does not govern whether defendant made a prima facie showing of underrepresentation on grand juries, we move to the question of whether defendant made a prima facie showing that Hispanics and Asian-Americans are underrepresented on Yolo County grand juries. We conclude that, with respect to the Sixth Amendment claim, defendant failed to make a prima facie showing of systematic exclusion of Hispanics and Asian-Americans in the jury selection

process, which is the third prong of the *Duren* test. Because we conclude defendant failed to make a prima facie showing on the third prong of the *Duren* test, we need not resolve contentions concerning the first (cognizable group) and second (statistical underrepresentation) prongs of the test.

■ Defendant failed to identify any aspect of the jury selection process that resulted in systematic exclusion of Hispanics and Asian-Americans from grand juries. To the contrary, jury commissioner Weaver testified that she makes efforts to reach out to organizations representing minority groups and that she reaches out to those with ethnic-sounding names. In this regard, this case is similar to *Burney, supra*, 47 Cal.4th at page 227, in which the Supreme Court found that the defendants failed to establish systematic exclusion. The court relied on evidence of the county's efforts to reach out to minorities to apply for grand jury service.

Analyzing facts similar to those presented here, the court in *Burney* stated: "As detailed above, [the] Jury Commissioner['s] declaration and testimony detailed the exhaustive efforts undertaken by the Orange County Superior Court Clerk's Office to invite Asian-Americans to apply for grand jury service. The defendants bringing the motion to quash offered no evidence to rebut the showing of substantial efforts undertaken by the county to include Asian-Americans in the venire, and offered no proof of any improper feature of the jury selection process. The defendants therefore failed to establish a prima facie case that the statistical discrepancies identified were caused by any systematic exclusion of Asian-Americans. Defendant's briefing in this court focuses upon the status of Asians as a cognizable group and upon the statistical comparisons that should be applied to claims of discrimination against prospective grand jurors, but points to no evidence in the record that would establish systematic exclusion. Accordingly, there is no merit in defendant's claim that Asian-Americans unconstitutionally were excluded from the grand jury that indicted him, and the trial court properly denied the motion to quash his indictment on that basis." (*Burney, supra*, 47 Cal.4th at p. 227.)

As in this case, the superior court in *Burney* used nonrandom processes to solicit applications for grand jury service. It solicited applications through private organizations, attempting to be inclusive of all ethnic groups. The court also used mass media and other outreach efforts. The Supreme Court found no constitutional problem with this nonrandom method. (*Burney, supra*, 47 Cal.4th at pp. 223–225.)

Our conclusion here is the same. Defendant "points to no evidence in the record that would establish systematic exclusion." (*Burney, supra*, 47 Cal.4th at p. 227.)

Defendant attempts to overcome this deficiency in showing systematic exclusion by pointing out a flaw in the jury selection process. The flaw is that when potential jurors who have already applied state, especially over the phone, that they are unable to serve because of the time commitment, Weaver makes a notation of the hardship on the application and does not process the application. The applicant is not asked to sign a statement concerning the hardship.

The jury commissioner has the authority to make hardship determinations; however, the statement of hardship must be in writing and signed by the potential juror. (Pen. Code, § 894; Code Civ. Proc., §§ 204, 218.) Even though the hardship statements were not signed by the potential jurors here, however, there is no evidence that this flawed process resulted in systematic exclusion of Hispanics and Asian-Americans from grand juries.

Defendant also claims that superior court judges reject statutorily qualified individuals for unauthorized reasons. Again, defendant does not make the connection between this asserted flaw in the jury selection process and the alleged systematic exclusion of Hispanics and Asian-Americans. Therefore, the claim is unpersuasive.

Defendant therefore failed to establish the third prong of the *Duren* test.[4] Because he failed to make a prima facie showing, defendant did not establish that his Sixth Amendment right has been violated.

---

[4] As to the second prong of the *Duren* test, defendant attempted to show underrepresentation of Hispanics and Asian-Americans using only ethnicity and age, without regard to whether the Hispanics or Asian-Americans were United States citizens, had lived in the county for a year, or could speak English well enough to serve on a grand jury.

Because we need not consider the second prong of the *Duren* test, we need not decide whether this partial showing of jury eligibility (using age only) was sufficient to establish the relevant proportions of the community that are Hispanic and Asian-American as part of defendant's prima facie case. We note, however, that the California Supreme Court, in *Horton, supra,* 11 Cal.4th 1068, included jury eligibility in its discussion of whether a defendant had successfully shown underrepresentation of a minority group on a jury venire.

The *Horton* court stated: "At defendant's trial, he challenged the jury venires as underrepresentative of the African-American and Hispanic populations within the 20-mile radius of the Norwalk courthouse, and did not present any evidence tending to establish that the percentage of these minorities on the jury venires at that courthouse was unfair in relation to the percentage of these minorities in the *jury-eligible* population of the Southeast Judicial District. For this reason, defendant failed to make a prima facie showing that the representation of African-Americans and Hispanics in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the 'community,' with the meaning of *Duren.* [Citation.]" (*Horton, supra,* 11 Cal.4th at pp. 1089–1090, italics added; see also *U.S. v. Torres-Hernandez, supra,* 447 F.3d at p. 704 [identifying split in Ninth Circuit concerning whether a defendant may use raw population data or, on the other hand, must account for jury eligibility in establishing second prong of *Duren* test].)

Similarly, the Fourteenth Amendment claim is a "nonstarter" because, as in a recent California Supreme Court case, "nothing in [the] rules or procedures authorized, encouraged, or established that the judges nominated grand jurors in a manner that discriminated against [Hispanics and Asian-Americans]." (*People v. Garcia, supra,* 52 Cal.4th at p. 738.) There is ample evidence in the record of nondiscriminatory motivations and methods of the superior court and its officers. (*Id.* at p. 739.)

The trial court properly denied defendant's motion to quash the indictment.

### 3. *Other Grand Jury Contentions*

Defendant makes several other contentions with respect to the motion to quash the indictment; however, we need not consider these contentions because they concern evidence presented by the prosecution and the sufficiency of the prosecution's rebuttal. Because defendant failed to make a prima facie showing, any evidence or showing on the part of the prosecution is irrelevant to this appeal. Thus, we do not consider whether the trial court properly (1) took judicial notice of the letter and table from Mary Heim, of the Department of Finance;[5] (2) considered hearsay contained with the table; (3) violated defendant's confrontation rights by admitting the letter and table; and (4) found that the prosecution rebutted a prima facie showing of systematic exclusion of Hispanics and Asian-Americans.

II–VI[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[5] On the prosecution's motion and over defendant's objection, the trial court took judicial notice of a letter and table prepared by the Department of Finance reflecting data from the 1990 and 2000 censuses, and including data concerning United States citizenship and English language proficiency. The table reflected that, in 2000, Hispanics made up 26 percent (43,707 divided by 168,660) of the population of Yolo County. And Asian and Pacific Islanders made up 10 percent (16,833 divided by 168,660) of the population of Yolo County. Of the population in Yolo County in 2000 who are not Hispanic, Asian, or Pacific Islander, 76 percent were United States citizens *and* spoke English well. Of the Hispanics in Yolo County, only 36 percent were United States citizens *and* spoke English well. And of the Asians and Pacific Islanders in Yolo County, 56 percent were United States citizens *and* spoke English well.

The prosecution made no attempt to authenticate the table beyond an unauthenticated letter accompanying the table from Mary Heim, chief of the Demographic Research Unit of the Department of Finance. The letter stated that the "table is a true and correct copy of Department of Commerce Decennial Census data as tabulated by the Department of Finance . . . ."

[*]See footnote, *ante*, page 704.

## DISPOSITION

The judgment is affirmed.

Raye, P. J., and Duarte, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 27, 2012, S201502.